1  Michael A. McConnell
   Clay M. Taylor
2  Kelly Hart & Hallman LLP
   201 Main Street, Suite 2500
3  Fort Worth, TX 76102
   Telephone: (817) 878-3566
4  Facsimile: (817) 878-9766

5  Counsel for Rossco Holdings, Inc.

```
                    ┌─────────────────────────┐
                    │         FILED           │
                    │                         │
                    │     NOV 0 9 2010        │
                    │                         │
                    │ CLERK U.S. BANKRUPTCY COURT │
                    │ CENTRAL DISTRICT OF CALIFORNIA │
                    │ BY:            Deputy Clerk  │
                    └─────────────────────────┘
```

6                 **UNITED STATES BANKRUPTCY COURT**
                  **CENTRAL DISTRICT OF CALIFORNIA**
7                      **LOS ANGELES DIVISION**

8  In re.                              )  Case No. 02:10-Bk-55951-VZ
                                       )
9  Rossco Holdings, Inc.               )  Chapter 11
                                       )
10                                     )  **ROSSCO HOLDINGS, INC.'S MOTION**
         Debtor.                       )  **FOR ORDER APPROVING AND**
11                                     )  **AUTHORIZING: (A) THE CLOSING OF**
                                       )  **THE SALE OF ASSETS TO PMH**
12                                     )  **ACQUISITION, LLC FREE AND CLEAR**
                                       )  **OF ALL LIENS, CLAIMS,**
13                                     )  **ENCUMBRANCES AND INTERESTS; (B)**
                                       )  **BIDDING PROCEDURES FOR THE**
14                                     )  **SALE OF THE ASSETS IF THE DEBTOR**
                                       )  **RECEIVES HIGHER AND BETTER**
15                                     )  **OFFER PRIOR TO APPROVAL OF THE**
                                       )  **SALE; AND (C) A BREAKUP FEE**
16                                     )
                                       )
17                                     )
                                       )
18                                     )  Date:   November 30, 2010
                                       )  Time:   11:00 a.m.
19                                     )  Judge:  Hon. Vincent P. Zurzolo
                                       )          Courtroom 1368
20                                     )          255 East Temple Street
                                       )          Los Angeles, CA 90012
21                                     )

22       Rossco Holdings, Inc. ("Rossco Holdings" or, the "Debtor") files its Motion for Order

23  Approving and Authorizing: (A) the Closing of the Sale of Assets to PMH Acquisition, LLC Free

24  and Clear of All Liens, Claims, Encumbrances and Interests; (B) Bidding Procedures for the Sale

25  of the Assets if the Debtor Receives Higher and Better Offer Prior to Approval of the Sale; and (C)

26

27

28

MOTION FOR ORDER APPROVING AND AUTHORIZING: (A) THE CLOSING OF THE SALE OF ASSETS TO PMH ACQUISITION, LLC
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) BIDDING PROCEDURES FOR THE SALE OF
THE ASSETS IF THE DEBTOR RECEIVES HIGHER AND BETTER OFFER PRIOR TO APPROVAL OF THE SALE; AND (C) A BREAKUP FEE      PAGE 1 OF 9

a Breakup Fee (the "Sale Motion").[1]  In support of the Sale Motion, Rossco Holdings would show the Court as follows:

## I.   JURISDICTION

1.     This Court has jurisdiction to consider the Sale Motion under 28 U.S.C. §§ 157 and 1334.  This matter involves a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The relief requested in the Sale Motion is authorized under §§ 105 and 363 of Title 11 of the United States Code (the "Bankruptcy Code") and Fed. R. Bankr. P. 6004 (the "Bankruptcy Rules").

## II.   BACKGROUND

### A.   PROCEDURAL HISTORY

2.     Rossco Holdings is a corporation engaged in the businesses of real property leasing, operating, management, development and sales.  It owns portions of and furnishes, either itself or through affiliates, general management, development and/or marketing of the real property businesses for, among others, WM Properties, Ltd., LJR Properties, Ltd., Monte Nido Estates, LLC, Colony Lodging, Inc. and Rossco Plaza, Inc., each of which have filed for bankruptcy relief.

3.     On August 2, 2010 (the "Petition Date"), Rossco Holdings filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Western District of Texas, Waco Division.  Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, Rossco Holdings continues to operate its business and manage its properties, affairs and assets as debtor-in-possession.

4.     The Debtor's bankruptcy case was transferred to the Central District of California, Los Angeles Division, on October 21, 2010.[2]

---

[1]  Declaration of Leonard Ross in Support of the Sale Motion is attached as **Exhibit A**.

[2]  The Debtor filed a virtually identical sale motion prior to the case being transferred to this District which was served in compliance with Fed. R. Bankr. P. 2002(c).  At the direction of the Central District of California's Clerks Office, Rossco Holdings is refiling the Sale Motion in this district and division.

**B.   ASSETS BEING SOLD AND TERMS OF SALE**

5.    Prior to, and since the Petition Date, Rossco Holdings and two non-debtor entities also owned by Leonard Ross, Lodgeco Properties, Ltd. ("Lodgeco") and CHSC, Ltd. ("CHSC"), have been negotiating with PMH Acquisition, LLC[3] ("PMH" or the "Purchaser") to sell approximately 7.7 acres of land located in College Station, Texas.  Of the 7.7 acres, Rossco Holdings has been negotiating the sale of: i) the 125 Meadowland lot; ii) the 127 Meadowland lot; iii) Lot 19, Meadowland Addition; iv) N 1/2 of Lots 4 and 5, Block 1, Addition; and v) 12 of 15 fourplex buildings (collectively, the "Assets").

6.    As a result of these negotiations, Rossco, Lodgeco and CHSC have agreed to sell the Assets to PMH for $9.75 million (the "Purchase Price"), pursuant to a Purchase and Sale Agreement.[4]  A copy of the Purchase and Sale Agreement is attached to the Sale Motion as **Exhibit B**.  The purchase price allocation for the property being sold by Rossco Holdings, Lodgeco and CHSC is as follows:

a.    Rossco Holdings - $4.5 million;

b.    Lodgeco - $5 million; and

c.    CHSC - $250,000.[5]

7.    The closing of the sale of the Assets shall occur after bankruptcy court approval is obtained and certain other conditions are met, including:  i) the expiration of a 90-day period to inspect the Assets; and ii) PMH obtaining approval to develop and construct apartment style housing of not less than 370 dwelling units and 600 bedrooms within 180 days of the date the

---

[3]  PMH's address is 3445 Peachtree Road NE, Suite 1400, Atlanta, Georgia 30326.

[4]  The purchase price is based upon PMH being able to secure a building permit to construct apartment style housing which has an aggregate bed count of 600 beds.  The purchase price may be adjusted upward or downward by $17,045 per bed if PMH receives a building permit for more or less beds.  Rossco Holdings has the right to terminate the Purchase and Sale Agreement in the event PMH fails to obtain permitting for a bed count of 500 or fewer.

Purchase and Sale Agreement was signed.

C. **DESCRIPTION OF NET CONSIDERATION TO THE BANKRUPTCY ESTATE**

8.     The Assets are subject to certain liens in favor of Prosperity Bank and OneWest Bank, FSB ("OneWest Bank"). Specifically, the fourplex buildings are subject to a lien in favor of Prosperity Bank in the amount of $848,826. The remaining Assets are subject to a lien in favor of OneWest Bank in the amount of $2,814,000.00. Lodgeco is a co-obligor on the OneWest Bank Note. At closing, the Prosperity Bank and OneWest Bank liens will be satisfied in full, with Rossco paying the Prosperity Bank Note and $510,000 of the OneWest Bank Note and Lodgeco paying $2,304,000 of the OneWest Bank Note.

9.     Pursuant to the Purchase and Sale Agreement, Rossco Holdings, Lodgeco and CHSC are also obligated to pay certain closing costs, which Rossco Holdings' estimated portion is $24,358.

10.     In addition, under the Purchase and Sale Agreement, Rossco Holdings shall be responsible for paying ad valorem taxes up to the time the sale closes. These costs will be paid from estate funds or sales proceeds. Given the contingencies involved, Rossco Holdings is unable to estimate this amount with any certainty. Moreover, Rossco Holdings' basis in the Assets is approximately $2 million and the allocated value of the Assets is $4.5 million. Therefore, it appears facially that Rossco Holdings will have to pay capital gains on approximately $2.5 million. However, at this point, the Debtor has not undertaken an analysis of any carry forward losses that may be available to it or current year capital gain losses which may impacts its tax liability. As a result, it is not able to determine the federal tax consequences of the sale at this time.

---

[5]  CHSC owns one-half of a right-of-way, comprising a very small portion of the property to be sold pursuant to the Purchase and Sale Agreement and would be impacted by a right of way agreement.

11.    Thus, after satisfying liens on the Assets and paying its portion of closing costs, Rossco Holdings estimates that the net consideration to the estate would be $3,116,816, less tax liability, if any.

**D.    BID PROCEDURES**

12.    PMH also understands that the Debtor is in bankruptcy and, as a result has a fiduciary duty to its creditors in order to obtain the highest and best offer for the Assets.  Thus, PMH has agreed that the Debtor may request that the Court implement the following bid procedures:

    a.    a sale hearing shall be held 60 days after the date the Court approves the bid procedures;

    b.    within 45 days prior to that date, the Debtor may solicit and receive bids to purchase the property (the "Bid Deadline");

    c.    PMH shall be paid a break up fee of $292,500 (the "Breakup Fee") in the event that the Debtor closes a sale with a purchaser other than PMH;

    d.    in order for a bid to be considered, it must exceed the Purchase Price by the amount of the Breakup Fee plus $50,000.  In addition, such bid shall:

- be in writing;

- not contain any financing or due diligence contingencies beyond those contained in the Purchase and Sale Agreement,

- be accompanied by a marked copy of the Purchase and Sale Agreement, which shall be the agreement pursuant to which such prospective purchaser proposes to acquire the assets sought to be acquired (proposals may not be for less than substantially all assets);

- be accompanied by evidence of committed financing or other ability to perform;

- be accompanied by a good-faith deposit of $50,000, payable to the Seller;

- be accompanied by a letter stating that the bidder's offer is irrevocable until the earlier of:  (i) two business days after the closing date of an alternative sale or sales approved by the Bankruptcy Court;

MOTION FOR ORDER APPROVING AND AUTHORIZING: (A) THE CLOSING OF THE SALE OF ASSETS TO PMH ACQUISITION, LLC FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) BIDDING PROCEDURES FOR THE SALE OF THE ASSETS IF THE DEBTOR RECEIVES HIGHER AND BETTER OFFER PRIOR TO APPROVAL OF THE SALE; AND (C) A BREAKUP FEE    PAGE 5 OF 9

and (ii) forty-five days after the conclusion of the Sale Hearing.

- A bid which satisfies these requirements shall be a "Qualifying Bid"[6];

e.   if a Qualifying Bid is received prior to the Bid Deadline, an auction (the "Auction") will be held three days thereafter;

f.   at the Auction, the initial bid shall be the highest Qualifying Bid received prior to the Bid Deadline (the "Initial Bid"). All subsequent bids, shall exceed the Initial Bid by at least $100,000 and parties shall be given a reasonable, but not excessive, amount of time to submit its overbids;

g.   at the conclusion of the Auction, the Debtor will select the highest and best offer which it will designate the successful bidder and will designate the second highest and best offer as the backup bidder. The Debtor will continue to designate backup bidders until PMH is the last backup bidder (unless PMH is the successful bidder). The Debtor shall file its designation of the successful bidder and designated backup bidders within two business days of the conclusion of the Auction;

h.   any party-in-interest shall have three business days to object to the Designation and request an emergency hearing on the matter or the Designation shall be deemed conclusive and final;

i.   if the Debtor closes a sale with a higher bidder, then the Debtor shall pay PMH the Breakup Fee within two days after the sale closes; and

j.   in the event the closing with the successful bidder does not occur, the Debtor may proceed to close with the backup bidder and any subsequent backup bidder thereafter.

13.   The procedures referred to in paragraph 11 shall be referred to as the Bid Procedures.

## IV.  RELIEF REQUESTED

14.   By this Motion, Rossco Holdings seeks approval of the following relief in accordance with §§ 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 6004:

(a)   Approval of the proposed Purchase and Sale Agreement, subject to higher and better offers;

(b)   Interim approval of the Bid Procedures by separate order of the Court on an expedited basis;

---

[6] For the avoidance of doubt, PMH's bid is a Qualifying Bid.

    (c)     Approval of, and authority to pay, the Breakup Fee in the event the Assets are sold to a bidder other than PMH;

    (d)     In the absence of qualifying bids under the Bid Procedures, approval of the sale to PMH;

    (e)     In the event of Qualify Bids, approval of the sale to the successful bidder or designated backup bidders; and

    (f)     Waiver of the fourteen-day stay under Bankruptcy Rule 6004(h).

15.    Rossco Holdings submits that the offer received by PMH represents fair value for the Assets. In this regard, Rossco Holdings submits that the relief sought in the Sale Motion is in the best interests of the Debtor's estate and believes that same will maximize the value of the Assets for the benefit of the estate and its creditors.

## V.  BASIS FOR RELIEF

16.    In order to achieve the highest and best price for the Assets, the proposed sale should be approved as soon as possible. Ample authority exists for approval of the proposed sale. Pursuant to § 363 of the Bankruptcy Code, "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). When a valid business justification exists, the law vests Rossco Holdings' decision to use or sell property outside the ordinary course of business with a strong presumption that in making a business decision it acts on an informed basis, in good faith and in the honest belief that the action taken is in the best interests of the company. *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Moreover, Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."

17.    Rossco Holdings' decision to sell the Assets is based upon its sound business

judgment. In this particular case, the best way to maximize recovery for the Debtor's creditors is by selling the Assets. In Rossco Holdings' business judgment, this can best be accomplished through this sale. Furthermore, selling the Assets in an expeditious manner is necessary since any delay could adversely impact the price received for the Assets.

18.    Rossco Holdings may not only sell the Assets under § 363(b), it may sell them free and clear of interests because at least one standard set forth in § 363(f)(1)-(5) has been met. In this particular case, OneWest Bank and Prosperity Bank allegedly hold such interests. Section 363(f)(3) provides that "the trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property." In this particular case, Prosperity Bank and OneWest Bank's liens will be fully satisfied from the proceeds of the sale. Therefore, the sale of the Assets may be consummated free and clear of all liens, claims, encumbrances or interests.

19.    The sale of the Assets in an expeditious fashion is essential. A delay in this process will only diminish recovery for the Debtor's respective creditors. The sale of the Assets is in the best interests of the estates, and all parties-in-interest, and represents the reasonable exercise of Rossco Holdings' business judgment. Therefore, the fourteen-day stay under Bankruptcy Rule 6004(h) should be waived.

## VI.    **NOTICE**

20.    No trustee, examiner, or creditors' committee has been appointed in this case. In accordance with Bankruptcy Rules 2002(a)(2), (c)(1), (k) and 6004(a), and LBR 6004, a copy of the Sale Motion and the Notice of Hearing on the Sale Motion will be served via electronic mail or first class mail to the United States Trustee and all creditors. The Debtor submits that the

1    information contained in the Sale Motion satisfies the notice requirements provided in Bankruptcy

2    Rule 2002(c)(1) and LBR 6004 and that no other or further notice need be given.

3                                          VII. **PRAYER**

4         Rossco Holdings requests that the Court:  (i) enter an interim order approving the Bid

5    Procedures; (ii) enter an order approving the sale of the Assets to PMH or designated successful

6    bidder or back up bidder free and clear of all liens, claims, and encumbrances pursuant to the

7    terms of the proposed Purchase and Sale Agreement; (iii) waive the fourteen-day stay so that the

8    sale may be closed immediately after approval by this Court; and (iv) grant any further relief to

9    which the Debtor may be justly entitled.  Rossco Holdings further requests that the Court find that

10   the buyer is a good faith buyer of the Assets and therefore entitled to all of the protections of §

11   363(m) of the Bankruptcy Code.

12

13

14                                          Respectfully submitted,

15

16                                          /s/

17                                          Michael A. McConnell
                                            Clay M. Taylor
18                                          KELLY HART & HALLMAN LLP
                                            201 Main Street, Suite 2500
19                                          Fort Worth, Texas 76102
                                            Telephone:   817/332-2500
20                                          Telecopy:    817/878-9280

21
                                            COUNSEL FOR ROSSCO HOLDINGS, INC.
22

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**LOS ANGELES DIVISION**

| | |
|---|---|
| In re. | Case No. 02:10-Bk-55951-VZ |
| Rossco Holdings, Inc. | Chapter 11 |
| Debtor. | **DECLARATION OF LEONARD ROSS IN SUPPORT OF ROSSCO HOLDINGS, INC.'S MOTION FOR ORDER APPROVING AND AUTHORIZING: (A) THE CLOSING OF THE SALE OF ASSETS TO PMH ACQUISITION, LLC FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) BIDDING PROCEDURES FOR THE SALE OF THE ASSETS IF THE DEBTOR RECEIVES HIGHER AND BETTER OFFER PRIOR TO APPROVAL OF THE SALE; AND (C) A BREAKUP FEE** |

DECLARATION OF LEONARD ROSS

I, Leonard Ross, declare as follows:

1. I am the President of Rossco Holdings, Inc. ("Rossco Holdings"). I have personal knowledge of the facts set forth in this Declaration and the Motion for Order Approving and Authorizing and Authorizing: (A) The Closing of the Sale of Assets to PMH Acquisition, LLC Free and Clear or All Liens, Claims, Encumbrances and Interests; (B) Bidding Procedures for the Sale of the Assets if the Debtor Receives Higher and Better Offer Prior to Approval of the Sale; and (C) A Breakup Fee (the "Sale Motion"), and if called as a witness, I could competently testify regarding these facts.

2. On August 2, 2010 (the "Petition Date"), Rossco Holdings filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Western District of Texas, Waco Division. Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, Rossco Holdings continues to

Exhibit A

1   operate its business and manage its properties, affairs and assets as debtor-in-possession.

2        3.    The Debtor's bankruptcy case was transferred to the Central District of California,

3   Los Angeles Division, on October 21, 2010.

4        4.    Prior to, and since the Petition Date, Rossco Holdings and two non-debtor entities

5

6   also owned by Leonard Ross, Lodgeco Properties, Ltd. ("Lodgeco") and CHSC, Ltd. ("CHSC"),

7   have been negotiating with PMH Acquisition, LLC[1] ("PMH" or the "Purchaser") to sell

8   approximately 7.7 acres of land located in College Station, Texas.  Of the 7.7 acres, Rossco

9   Holdings has been negotiating the sale of: i) the 125 Meadowland lot; ii) the 127 Meadowland lot;

10

11   iii) Lot 19, Meadowland Addition; iv) N 1/2 of Lots 4 and 5, Block 1, Addition; and v) 12 of 15

12   fourplex buildings (collectively, the "Assets").

13        5.    As a result of these negotiations, Rossco, Lodgeco and CHSC have agreed to sell the

14   Assets to PMH for $9.75 million (the "Purchase Price"), pursuant to a Purchase and Sale

15   Agreement.[2]  A copy of the Purchase and Sale Agreement is attached to the Sale Motion as

16   Exhibit B.  The purchase price allocation for the property being sold by Rossco Holdings,

17   Lodgeco and CHSC is as follows:

18

19          a.    Rossco Holdings - $4.5 million;

20          b.    Lodgeco - $5 million; and

21          c.    CHSC - $250,000.[3]

22        6.    The closing of the sale of the Assets shall occur after bankruptcy court approval is

23

---

24   [1]  PMH's address is 3445 Peachtree Road NE, Suite 1400, Atlanta, Georgia 30326.

25   [2]  The purchase price is based upon PMH being able to secure a building permit to construct apartment style housing
26   which has an aggregate bed count of 600 beds.  The purchase price may be adjusted upward or downward by $17,045
per bed if PMH receives a building permit for more or less beds.  Rossco Holdings has the right to terminate the
Purchase and Sale Agreement in the event PMH fails to obtain permitting for a bed count of 500 or fewer.

27   [3]  CHSC owns one-half of a right-of-way, comprising a very small portion of the property to be sold pursuant to the
28   Purchase and Sale Agreement and would be impacted by a right of way agreement.

obtained and certain other conditions are met, including: i) the expiration of a 90-day period to inspect the Assets; and ii) PMH obtaining approval to develop and construct apartment style housing of not less than 370 dwelling units and 600 bedrooms within 180 days of the date the Purchase and Sale Agreement was signed.

7.     The Assets are subject to certain liens in favor of Prosperity Bank and OneWest Bank, FSB ("OneWest Bank"). Specifically, the fourplex buildings are subject to a lien in favor of Prosperity Bank in the amount of $848,826. The remaining Assets are subject to a lien in favor of OneWest Bank in the amount of $2,814,000.00. Lodgeco is a co-obligor on the OneWest Bank Note. At closing, the Prosperity Bank and OneWest Bank liens will be satisfied in full, with Rossco paying the Prosperity Bank Note and $510,000 of the OneWest Bank Note and Lodgeco paying $2,304,000 of the OneWest Bank Note.

8.     Pursuant to the Purchase and Sale Agreement, Rossco Holdings, Lodgeco and CHSC are also obligated to pay certain closing costs, which Rossco Holdings' estimated portion is $24,358.

9.     In addition, under the Purchase and Sale Agreement, Rossco Holdings shall be responsible for paying ad valorem taxes up to the time the sale closes. These costs will be paid from estate funds or sales proceeds. Given the contingencies involved, Rossco Holdings is unable to estimate this amount with any certainty. The Debtor has not undertaken an analysis of any carry forward losses that may be available to it or current year capital gain losses which may impacts its tax liability. As a result, it is not able to determine the federal tax consequences of the sale at this time.

10.     Thus, after satisfying liens on the Assets and paying its portion of closing costs, Rossco Holdings estimates that the net consideration to the estate would be $3,116,816, less tax

1    liability, if any.

2        11.    PMH has agreed that the Debtor may request that the Court implement the following

3    bid procedures:

4        a.    a sale hearing shall be held 60 days after the date the Court approves the bid
5            procedures;

6        b.    within 45 days prior to that date, the Debtor may solicit and receive bids to
7            purchase the property (the "Bid Deadline");

8        c.    PMH shall be paid a break up fee of $292,500 (the "Breakup Fee") in the
        event that the Debtor closes a sale with a purchaser other than PMH;

9

10       d.    in order for a bid to be considered, it must exceed the Purchase Price by the
            amount of the Breakup Fee plus $50,000. In addition, such bid shall:

11       •    be in writing;

12       •    not contain any financing or due diligence contingencies beyond those
13           contained in the Purchase and Sale Agreement,

14       •    be accompanied by a marked copy of the Purchase and Sale
15           Agreement, which shall be the agreement pursuant to which such
            prospective purchaser proposes to acquire the assets sought to be
16           acquired (proposals may not be for less than substantially all assets);

17       •    be accompanied by evidence of committed financing or other ability
18           to perform;

19       •    be accompanied by a good-faith deposit of $50,000, payable to the
            Seller;
20

21       •    be accompanied by a letter stating that the bidder's offer is
            irrevocable until the earlier of: (i) two business days after the closing
22           date of an alternative sale or sales approved by the Bankruptcy Court;
            and (ii) forty-five days after the conclusion of the Sale Hearing.

23

24       •    A bid which satisfies these requirements shall be a "Qualifying Bid"[4];

25       e.    if a Qualifying Bid is received prior to the Bid Deadline, an auction (the
            "Auction") will be held three days thereafter;

26       f.    at the Auction, the initial bid shall be the highest Qualifying Bid received

27

28    _____
    [4]  For the avoidance of doubt, PMH's bid is a Qualifying Bid.

DECLARATION OF LEONARD ROSS                                          PAGE 4 OF 6

prior to the Bid Deadline (the "Initial Bid").  All subsequent bids, shall exceed the Initial Bid by at least $100,000 and parties shall be given a reasonable, but not excessive, amount of time to submit its overbids;

g.   at the conclusion of the Auction, the Debtor will select the highest and best offer which it will designate the successful bidder and will designate the second highest and best offer as the backup bidder. The Debtor will continue to designate backup bidders until PMH is the last backup bidder (unless PMH is the successful bidder).   The Debtor shall file its designation of the successful bidder and designated backup bidders within two business days of the conclusion of the Auction;

h.   any party-in-interest shall have three business days to object to the Designation and request an emergency hearing on the matter or the Designation shall be deemed conclusive and final;

i.   if the Debtor closes a sale with a higher bidder, then the Debtor shall pay PMH the Breakup Fee within two days after the sale closes;

j.   in the event the closing with the successful bidder does not occur, the Debtor may proceed to close with the backup bidder and any subsequent backup bidder thereafter;

12.   The procedures referred to in paragraph 11 shall be referred to as the Bid Procedures.

13.   By the Motion, Rossco Holdings seeks approval of the following relief in accordance with § 363 of the Bankruptcy Code and Bankruptcy Rule 6004:

(a)   Approval of the proposed Purchase and Sale Agreement, subject to higher and better offers;

(b)   Interim approval of the Bid Procedures by separate order of the Court on an expedited basis;

(c)   Approval of, and authority to pay, the Breakup Fee in the event the Assets are sold to a bidder other than PMH;

(d)   In the absence of qualifying bids under the Bid Procedures, approval of the sale to PMH;

(e)   In the event of Qualify Bids, approval of the sale to the successful bidder or designated backup bidders; and

(f)   Waiver of the fourteen-day stay under Bankruptcy Rule 6004(h).

14.   Rossco Holdings submits that the offer received by PMH represents fair value for the

Assets. In this regard, Rossco Holdings submits that the relief sought in the Sale Motion is in the best interests of the Debtor's estate and believes that same will maximize the value of the Assets for the benefit of the estate and its creditors.

15.    Rossco Holdings also submits that the sale of the Assets in an expeditious fashion is essential. A delay in this process will only diminish recovery for the Debtor's respective creditors. Therefore, the fourteen-day stay under Bankruptcy Rule 6004(h) should be waived.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 8th day of November, 2010, at Beverly Hills, California.

Leonard Ross
President of Rossco Holdings, Inc

Label Matrix for local noticing
0973-2
Case 2:10-bk-55970-VZ
Central District Of California
Los Angeles
Tue Nov  9 08:32:48 PST 2010

Los Angeles Division
255 East Temple Street,
Los Angeles, CA 90012-3332

Bernice James
Santa Barbara County Tax Collector
P.O. Box 579
Santa Barbara, CA 93102-0579

Leonard M. Ross
1009 N. Beverly Dr
Beverly Hills, CA 90210-2328

OneWest Bank FSB
390 West Valley Pkwy
Escondido, CA 92025-2635

Pacific Merchantile Bank
9720 Wilshire Blvd
Beverly Hills, CA 90212-2021

Rossco Holdings, Inc.
PO Box 10539
Beverly, CA 90213-3539

Clay M Taylor
Kelly Hart & Hallman
201 Main St Ste 2500
Ft Worth, TX 76102-3194

Texas Comptroller of Public Accounts
Jay W. Hurst
P.O. Box 12548
Austin, TX 78711-2548

Amero Management Co.
1011 1/2 Beverly Dr
Beverly Hills, CA 90210-2328

Henry S Miller Commercial
Attn: Charlie Roof
10123 Broadway
San Antonio, Texas 78217-4420

Leonard M. Ross Revocable Trust
1011 1/2 N Beverly Dr
Beverly Hills, CA 90210-2328

OneWest Bank, FSB
c/o Monica S. Blacker
Andrews Kurth LLP
1717 Main St., Suite 3700
Dallas, TX 75201-7301

RFF Family Partnership
226 Twenty-Third St
Santa Monica, CA 90402

United States Trustee (LA)
725 S Figueroa St., 26th Floor
Los Angeles, CA 90017-5524

Kelly Hart
Kelly Hart & Hallman LLP
201 Main St Ste 2500
Ft Worth, TX 76102-3194

WM Properties, Ltd.
1011 1/2 North Beverly Drive
Beverly Hills, CA 90210-2328

Bell TAD
c/o Lee Gordon
P.O. Box 1269
Round Rock, TX 78680-1269

Law Offices of David B Giles
Meadow Park Tower
10440 N Central Expwy ste 1030
Dallas, Texas 75231-2271

Michael A. McConnell
C. Josh Osborne
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102-3194

Pacific Mercantile Bancorp
c/o Munsch Hardt Kopf & Harr, PC
Attn: Patricia B. Tomasco
401 Congress Avenue, Suite 3050
Austin, TX 78701-4506

Rossco Holdings Incorporated
410 S Texas Ave
College Station, TX 77840-1724

Christopher Joshua Osborne
Kelly Hart & Hallman LLP
201 Main St Ste 2500
Fort Worth, TX 76102-3194

Robert M. Yaspan
Law Office of Robert M. Yaspan
21700 Oxnard Street, Suite 1750
Woodland Hills, CA 91367-7593

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Courtesy NEF

(u)Pacific Mercantile Bank

(d)Leonard M. Ross Revocable Trust
1011 1/2 N. Beverly Dr
Beverly Hills, CA 90210-2328

(d) Leonard M. Ross.
1009 N. Beverly Dr
Beverly Hills, CA 90210-2328

End of Label Matrix
Mailable recipients    23
Bypassed recipients     4
Total                  27

# EXHIBIT B

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "Agreement") is made and entered into by and between **Lodgeco Properties, Ltd.,** a Texas limited partnership ("**Lodgeco**"), **CHSC, Ltd.,** a Texas limited partnership ("**CHSC**"), and **Rossco Holdings Incorporated,** a California corporation ("**Rossco**"), as their interest may appear (Lodgeco, CHSC and Rossco shall be referred to herein collectively as "**Seller**"), and **PMH ACQUISITION, LLC,** a Georgia limited liability company and/or its successor or assigns ("**Purchaser**").

1.    **PURCHASE AND SALE.** Subject to the terms and conditions of this Agreement, and for and in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration to it in hand paid, the receipt and sufficiency of which are hereby acknowledged, Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller all of the following (collectively, the "**Property**"):

That certain real property consisting in approximately 7.7 gross acres of land located in the City of College Station, Brazos County, Texas, as more particularly shown as cross-hatched and outlined on **Exhibit "A"** attached hereto and made a part hereof, including all right, title and interest of Seller, if any, in and to all appurtenant streets, alleys, waterways, rights-of-way, buildings, improvements, and structures, any strips or gores between the Property, including all water and mineral rights, and all plants, shrubbery, trees, timber and all tenements, hereditaments, easements, access rights, and parking rights benefitting the Property.

2.    **PURCHASE PRICE.** Subject to credits, adjustments and prorations for which provisions are hereinafter made in this Agreement, the total purchase price to be paid by Purchaser for the Property, and received and accepted by Seller, is NINE MILLION SEVEN HUNDRED AND FIFTY THOUSAND AND 00/100 DOLLARS ($9,750,000.00) ("Purchase Price") based on an expected Bed Count (as defined in Section 8(d)) of six hundred (572) bedrooms for the Project (as defined in Section 8(d)). If as a result of Purchaser's efforts related to Final Development Approvals, Purchaser receives a building permit for more or less than a Bed Count of 572, then the Purchase Price shall be decreased or increased at the rate of SEVENTEEN THOUSAND AND FORTY-FIVE AND NO/100 Dollars ($17,045.00) per bed. The Purchase Price shall be payable at Closing by wire transfer of immediately available funds to an account designated by the Escrow Agent and the closing funds shall be disbursed as is customary for commercial real estate transactions.

3.    **EARNEST MONEY.** Within five (5) business days of the execution of this Agreement by Seller and Purchaser and Escrow Agent's signature hereto, the sum of FIFTY THOUSAND AND NO/100 DOLLARS ($50,000.00) shall be deposited by Purchaser as an earnest money deposit hereunder (the "**Earnest Money**"), which Earnest Money shall be held by the National Business Unit of Fidelity Title Insurance Company located in Atlanta, Georgia ("**Escrow Agent**") (provided however, Escrow Agent shall designate the Earnest Money be held at the National Business Unit located in Dallas, Texas) in escrow and shall be held subject to disbursement in accordance with the terms and provisions of this Agreement and the terms and conditions of escrow set forth on **Exhibit "B"** attached hereto and incorporated herein. The Earnest Money shall be held in interest bearing bank accounts, which have Federal Deposit Insurance coverage, and interest earned thereon shall also be part of the Earnest Money and shall be reported under Purchaser's U.S. Taxpayer Identification Number. Except as otherwise provided elsewhere in this Agreement, the Earnest Money and any interest earned thereon shall be

credited to and considered as payment of part of the total Purchase Price for the Property at the time of the Closing.

    4.    **COVENANTS, REPRESENTATIONS AND WARRANTIES OF SELLER.** Seller hereby covenants, represents and warrants to Purchaser that the following facts are, as of the date hereof, and will be, as of the date of Closing, true and correct:

    (a)    To Seller's knowledge, there are no violations of any governmental laws, ordinances, rules, regulations or orders relating to pollution, safety, health, building, fire or zoning in connection with the Property.

    (b)    There are no arrangements or contractual obligations or assessments of any kind, including service or operating contracts or commitments to any third party or governmental agency that would affect or impose any obligation on the Purchaser or the Property subsequent to the Closing Date.

    (c)    Seller is the owner of fee simple title to the Property and has full right, power and authority to execute, deliver and carry out the terms and conditions of this Agreement and all other documents to be executed and delivered by Seller pursuant to or in connection with this Agreement. All requisite resolutions, corporation or partnership, and any other consents, necessary for the consummation by Seller of the transaction herein described, have been or will before Closing be duly adopted and obtained.

    (d)    No person or entity has any right of first refusal or option to acquire the Property. There are no parties in possession or with any possessory rights, including licenses, in respect to the Property.

    (e)    Except as set forth on Schedule 4(e) attached hereto and made a part hereof, there is no action or proceeding pending against Seller, or, to Seller's knowledge, any part of the Property, which, if determined adversely as to the Seller, Purchaser or the Property, would have a material adverse effect on the Property, and to the best of Seller's knowledge and belief, no such action is contemplated or threatened by any party.

    (f)    The Property has full and free access to and from public streets or roads.

    (g)    Seller has not received any written notice of and has no knowledge of the issuance of any notice in respect to a requirement by any agency of any governmental agency or by any other person or entity that the Property requires any actions, including cleanup or removal regarding any hazardous waste, hazardous material or any other substance regulated by any state or Federal environmental laws. To the best knowledge and belief of Seller, the issuance of such a notice is not threatened or contemplated by any such agency or other person or entity. To Seller's knowledge, there are no buried materials on the Property and the Property has not been used for the purposes of storing, manufacturing or dumping and does not contain any hazardous waste or hazardous substances as defined in Federal Comprehensive Environmental Response Compensation and Liability Act of 1980 as amended or any other environmental protection laws.

    (h)    Other than on-site or off-site City of College Station development requirements or restrictions imposed upon the Property in connection with Final

2

Development Approvals, to Seller's knowledge, there is no existing, proposed or contemplated plan to widen, modify or realign any street or highway adjoining the Property which would affect access thereto, or any existing proposed or contemplated eminent domain proceeding that would affect the Property in any way whatsoever.

(i)    Seller has no knowledge of any non-monetary restrictions or encumbrances affecting the Property which would hinder or preclude the development of the Property as a multi-family residential project.

5.    **ADDITIONAL DOCUMENTS AND INFORMATION**. Within ten (10) business days after the date of this Agreement, Seller shall deliver to Purchaser the following documents and items (the "**Additional Documents and Information**") to the extent in Seller's possession:

(a)    Copies of all surveys (including any existing survey), site plans, title reports, title insurance policies, including copies of exceptions in the title policies, environmental reports or studies, wetlands studies, engineering or similar types of reports, and architectural and engineering drawings relating to the Property, as well as copies of all information in Seller's possession addressing survey, soil, geological or environmental condition of the Property.

(b)    Copies of all contracts, permits, pleadings, documents or other agreements in Seller's possession affecting or otherwise related to the Property; copies of all real estate tax bills for the years 2008, 2009 and 2010, if available; and evidence of any development entitlements and approvals applicable to the Property from the appropriate governmental authorities. Upon request of Purchaser, Seller shall provide Purchaser with reasonable access to any pleadings related to the litigation listed on Schedule 4(e).

6.    **SELLER'S OBLIGATIONS**. Between the date hereof and Closing, Seller shall have the following obligations:

(a)    Seller shall cooperate, at no out of pocket monetary cost to Seller, with Purchaser in obtaining any consents or other similar approvals necessary or appropriate to allow Purchaser to consummate this transaction including executing any documents or providing information that may be necessary or required in connection with Final Development Approvals (as defined below).

(b)    Seller agrees to and shall execute all documents and undertake all reasonable actions, at no out of pocket monetary cost to Seller, in connection with any permitting or authorizations related to Property as may be necessary or appropriate in connection with Final Development Approvals, including appearing at any public meetings, if necessary, or hearings in relation thereto. Seller specifically acknowledges that local governmental authorities may require certain documents or applications related to Purchaser's development of the Property be submitted in Seller's name and Seller hereby concurs and agrees to reasonably cooperate by signing and submitting such documents as required.

(c)    Seller shall cooperate with Purchaser as set forth in Section 18.

(d)    The Seller and Purchaser acknowledge that this Agreement and the sale of the Property are subject to the approval of the United States Bankruptcy Court, Western

SGR\13977SGR\1397714.95.005

Division of Texas, Waco Division (the **"Bankruptcy Court"**) in Case No. 10-60953 pending in the Bankruptcy Court. The Seller and Purchaser acknowledge that to obtain such approval, the Seller must file a motion to approve the sale (the **"Sale Motion"**) and demonstrate that it has taken reasonable steps to obtain the highest and best offer possible for the Property, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court, and conducting an auction (the "**Auction**"). Seller shall obtain an order from the Bankruptcy Court which (i) authorizes the sale of the Property free and clear of liens, claims and encumbrances pursuant to Section 363(f), (ii) is satisfactory to Purchaser in all respects, (iii) authorizes Seller to sell the Property to Purchaser; (v) approves the sale and purchase of the Property upon the terms and subject to the conditions of this Agreement; (vi) finds that Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Code; (vii) finds that this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (viii) provides that this Agreement and the transactions contemplated hereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, Seller or any chapter 7 or chapter 11 trustee of Seller; and (ix) denies or otherwise resolves any objections to the proposed transaction in a manner reasonably acceptable to Seller and Purchaser (collectively the orders of Bankruptcy Court referenced in clauses (i) – (ix) of this paragraph inclusive are referred to as the **"Sale Order"**). Following the expiration of all appeals of such Sale Order (or expiration of the time for filing any such appeals if such appeal is not filed) without modification of such Sale Order and without the entry of a stay of consummation of the sale and purchase transaction as set forth in this Agreement, the Sale Order shall become the **"Final Order"**. In the event any appeal or other contest is taken by any party to the Sale Order, Seller shall use reasonable efforts to resolve such appeal or other contest in favor of this Agreement. In the event the Sale Order does not become a Final Order within 15 calendar days after entry of the Order by the Bankruptcy Court, Purchaser shall have the right to terminate this Agreement and, upon such termination, the Earnest Money Deposit and any interest earned thereon shall be refunded to Purchaser without any further action, consent or release by Seller.

7.    **CONDITIONS PRECEDENT TO PURCHASER'S PERFORMANCE**. Purchaser shall not be obligated to perform under this Agreement unless each of the following conditions shall have been fulfilled at Closing:

(a)    Seller shall have timely performed its obligations under this Agreement in all material respects.

(b)    As of the Closing Date, Seller's representations and warranties shall be true, correct and complete in all material respects.

(c)    Purchaser has obtained Final Development Approvals.

(d)    Seller has satisfied each of Seller's Obligations (as defined in Section 18).

(e)    Seller shall have obtained the Final Order.

4

8.    **DUE DILIGENCE**.

(a)    Examination of the Property. Purchaser shall have the privilege, during the existence of this Agreement, of going upon the Property to inspect, examine, survey and make engineering, environmental, or landscaping tests or such other studies or surveys which it may deem necessary in its sole discretion regarding the Property and the development thereof.   Should anyone attempt to file a lien against the Property by reason of the Purchaser's activities, the Purchaser shall have the same canceled and discharged of record within thirty (30) days after Purchaser receives notice thereof. In the event Purchaser shall fail or refuse to cancel or discharge such lien, Seller may do so at Purchaser's cost and expense. Purchaser hereby indemnifies and agrees to hold Seller harmless from and against any and all liens, liabilities, claims, actions, damages, costs, and expenses and against any and all claims for death or injury to persons or damage to properties arising out of or as a result of Purchaser's or its agents or contractors or other representatives or their employees going upon the Property pursuant to the provisions of this Paragraph or otherwise.   This obligation to indemnify and hold Seller harmless shall survive the Closing and any termination of this Agreement. Purchaser shall promptly restore the Property to its condition on the date hereof to the extent practicable after all such tests or surveys, with Purchaser's obligation so to restore to survive any termination of this Agreement. Purchaser shall also be permitted to examine all records, real estate tax assessment information and all other information pertaining to the Property which is in the possession or control of Seller.

(b)    Inspection Period. In the event Purchaser is not satisfied with the results of the foregoing inspection and examination on or before NINETY (90) days from the Effective Date of this Agreement (said period hereinafter referred to as the "**Inspection Period**"), Purchaser may notify Seller that it elects to terminate this Agreement, for any or no reason, at which time neither Seller nor Purchaser shall have any further obligations under this Agreement, and Escrow Agent shall immediately return the Earnest Money to Purchaser without any further action, consent, or release by Seller.

(c)    Financing Contingency. Purchaser shall have obtained financing (the "**Financing**") for the acquisition and development of Purchaser's proposed project to be constructed as contemplated by the Final Development Approvals on such terms and conditions as Purchaser may reasonably approve, provided such financing is consistent with terms customarily available from institutional lenders for similar types of projects. Purchaser agrees to diligently pursue the Financing and, upon request, to advise Seller of the status thereof. In the event that Purchaser is unable to obtain the Financing on or before ONE HUNDRED AND TWENTY (120) days following the date hereof, Purchaser may (1) terminate this Agreement and receive a full refund of the Earnest Money, or (2) waive this condition precedent and proceed to Closing. In the event that Purchaser has not terminated this Agreement based upon a failure by Purchaser to obtain the Financing on or before 125 days following the date hereof, Purchaser will be deemed to have waived this contingency to Closing.

(d)    Final Development Approvals. Purchaser shall have obtained Final Development Approvals (as hereinafter defined) of the Property in a manner which will result in the Property being zoned to a zoning classification of Purchaser's choosing which allows Purchaser to develop and construct apartment style housing of not less than 370 dwelling units and 600 bedrooms (the "**Project**"). "**Final Development Approvals**" as used herein

SGR\13977SGR\13977\4.95.005

means: (i) that all legal requirements for rezoning, replatting, site plan approval (including a Bed Count of 572), and all permitting have been completed; (ii) that the appropriate governmental authorities have taken all necessary actions for such rezoning, replatting, site plan, and permitting; (iii) that all periods within which appeal, suit or other challenge to the rezoning, replatting, site plan, or permitting of the Property could be asserted have expired without any such appeal, suit or challenge having been made, and in the event that a challenge or appeal has been made, such appeal or challenge shall have been finally resolved in the Purchaser's favor; and (iv) Purchaser shall have obtained all administrative and regulatory approvals, permits and consents to construct the improvements on the Property as approved, including without limitation any grading or building permits. Purchaser agrees to diligently and in good faith pursue Final Development Approvals of the Property in accordance with this Agreement. In the event that Purchaser is unable to obtain Final Development Approvals on or before ONE HUNDRED AND EIGHTY (180) days following the date hereof, Purchaser may (1) terminate this Agreement and receive a full refund of the Earnest Money, or (2) waive this condition precedent and proceed to Closing. The later of (i) the date on which Purchaser obtains Final Development Approvals, or (ii) 185 days following the date hereof, shall be deemed the "**Development Approvals Date.**" The defined term "**Bed Count**" shall refer to the actual number of bedrooms finally approved by city, county, and other local authorities for the Project as determined by written correspondence confirming Purchaser's right to obtain a building permit to construct such number of bedrooms as part of the Project. Notwithstanding anything herein to the contrary, in the event that Purchaser elects to proceed with the Closing with a Bed Count of 500 or less, and Seller has been provided with written confirmation from city, county or other local authorities, indicating Purchaser's right to obtain a building permit to construct not more than 500 bedrooms, then Seller shall have the option to terminate this Agreement, provided however, all Earnest Money shall be refunded to Purchaser. Seller and Purchaser agree to amend this Agreement (the "**Price Amendment**") in accordance with the terms of this Section 8(d) and Section 2, on or before 30 days following Purchaser's receipt of written confirmation of the Bed Count in order to confirm the Purchase Price.

(e)     Intentionally Omitted.

(f)     Termination. In the event that Purchaser elects to terminate this Agreement pursuant to this Section 8, Purchaser shall pay Seller the sum of $100.00 as consideration for such termination right and be entitled to a prompt refund of the Earnest Money, whereupon this Agreement shall terminate and be of no further force and effect, except for the indemnification obligation set forth in Section 8(a) above.

(g)     Utility Availability. Notwithstanding anything contained herein to the contrary, if at or prior to Closing, any utility company or governmental entity takes any action, including any moratorium, that results in the non-availability (including the lack of sufficient pressures or capacities) to the Property at Closing of any utility necessary for the development thereof, then Purchaser may terminate this Agreement and be entitled to a prompt refund of the Earnest Money, whereupon this Agreement shall be of no further force and effect except for the indemnification obligation set forth in Section 8(a) above.

SGR\13977SGR\13977\4.95.005

9.    **TITLE AND SURVEY**.

(a)    Title Commitment. Within thirty (30) days after the execution hereof, Purchaser shall obtain and provide to Seller an ALTA standard form of Commitment for Owner's Title Insurance listing Purchaser as the named insured (the "**Title Commitment**") issued by Fidelity Title Insurance Company ("**Title Insurer**"), setting forth the state of title to the Property and all exceptions, including easements, deed restrictions, other restrictions, rights-of-way, covenants, reservations, and other conditions, if any, affecting the Property which would appear in an Owner's Title Policy, if issued, and a certificate from the Title Insurer, indicating the amount, if any (or if none, so stating), of any real estate taxes attributable to the Property including, without limitation, taxes arising by virtue of any special use valuations affecting the Property.

(b)    Survey. On or before the expiration of the Inspection Period, Purchaser shall, at Purchaser's sole cost and expense, obtain and provide to Purchaser an accurate ALTA/ACSM Land Title Survey of the Property prepared by a surveyor registered under the laws of the State of Texas, which survey shall show (i) the number of acres contained in the Property, and (ii) the Gross Acreage, to the nearest one thousandth (1/1000th) of an acre (the "**Survey**"). The Survey shall contain a legally sufficient description of the metes and bounds of the Property. The legal description of the Property based upon the Survey shall (i) become a part of this Agreement without the necessity of any further action by either of the parties hereto, (ii) replace the description of the Property attached hereto as **Exhibit "A"**, and (iii) be used in the Deed. Purchaser shall pay all costs and expenses incurred in connection with the preparation of the Survey (whether in satisfaction of a Title Company requirement for the Owner Policy or a requirement of Purchaser's lender, if any, or otherwise).

(c)    Title Objections and Permitted Exceptions. In the event any exceptions appear in such Title Commitment or title documents or in the Survey that are reasonably unacceptable to Purchaser ("**Purchaser's Objections**"), then Purchaser shall notify Seller in writing of such fact on or before the expiration of the Inspection Period. Seller shall use its best efforts to eliminate or modify such unacceptable exceptions to the reasonable satisfaction of Purchaser. In addition, Seller shall be obligated to remove at or prior to Closing, all mortgages, deeds of trust or other liens or encumbrances which encumber the Property which can be cured or removed by the payment of money. Seller covenants and agrees that it shall not, without the prior written consent of Purchaser, permit any encumbrances to be filed against the Property following the execution hereof. Purchaser reserves the right to object, on or before the Closing Date, to any new matter shown in an updated title commitment, revised survey, updated title search, or any other new matter (hereinafter, "**New Matter**") of title not included in the Title Commitment or not shown on the Survey at the time Purchaser delivers Purchaser's Objections to Seller. In the event that such New Matter is not cured by Seller for any or no reason, Purchaser shall be entitled to terminate this Agreement and receive a full refund of the Earnest Money. Any exceptions to title to which Purchaser does not object on or before Closing and any matter objected to but not cured by Seller and which Purchaser elects to accept shall be deemed to be "**Permitted Exceptions**."

10.    **CLOSING**. The Closing shall take place at the offices of Title Insurer, or such other location as may be determined by Purchaser, on or before ninety (90) days following the later to occur of the date on which (i) the Inspection Period expires, or (ii) the Development Approvals Date, or (iii) Seller has fully satisfied Seller's Obligations (the "**Closing Date**"). To the extent possible, the parties agree to

7

cooperate to close the transaction by mail through the Title Insurer. Except to the extent reasonably necessary to extend Closing in order that Purchaser may obtain Purchaser's building permits to commence construction, the Closing shall occur on or before April 30, 2011.

      (a)    At Closing, Seller shall deliver to Purchaser the following items, which items shall be in form and substance reasonably satisfactory to Purchaser:

      (i)    A Special Warranty Deed in recordable form conveying good and marketable fee simple title to the Property, subject only to the Permitted Exceptions, reciting only nominal consideration and a quitclaim deed to the Property based upon the Survey.

      (ii)    A standard non-foreign affidavit stating Seller is not a foreign entity.

      (iii)    An owner's affidavit in the form required by the Title Insurer.

      (iv)    Any other items or documents affecting the conveyance and sale of the Property which may be reasonably requested by the Purchaser or the Title Insurer to satisfy the Seller's requirements and the "standard exceptions" as set forth in the Title Commitment.

      (b)    Purchaser shall deliver to Seller:

      (i)    The Purchase Price provided for in Section 2 herein, subject to Section 18(c).

      (ii)    Any other items or documents affecting the conveyance and sale of the Property which may be reasonably requested by Seller or the Title Insurer.

11.    **COSTS PAID AT CLOSING**. Seller shall pay the cost of Seller's counsel, the cost of an Owner's policy of title insurance in the amount of the Purchase Price (provided however, Purchaser shall be responsible to pay the cost of any title insurance endorsements or extended coverage), the cost of preparing the deed, transfer tax (if any), document taxes, all charges for the preparation and recordation of any releases or instruments required to clear Seller's title for conveyance in accordance with the provisions of this Agreement, and one-half (1/2) of any escrow fee charged by the Escrow Agent. Purchaser will pay the cost of Purchaser's counsel, the cost of any survey or survey update, recording fees, all charges for the recordation of the instruments conveying title to the Property, and one-half (1/2) of any escrow fee charged by the Escrow Agent. All other costs shall be paid according to the custom of the locality where the Property is located.

12.    **PRORATIONS**. All items of income and expense attributable to the Property, including all ad valorem taxes for the then current year, and other proratable items of income or expense shall be prorated at the Closing, effective as of 11:59 p.m. of the day of the Closing Date. Seller shall pay any taxes and subsequent assessments, if any, for prior years due to changes in land usage or ownership, including any rollback taxes. If the Closing Date occurs before the ad valorem tax rate is fixed for the then current year, the apportionment of taxes shall be on the basis of the tax rate for the preceding year

applied to the latest assessed valuation, such proration to be adjusted following Closing upon determination of the final tax amount (after appeal if appealed).

13.    **CONDEMNATION.** If, prior to Closing, the Property or part thereof is subject to an eminent domain or condemnation proceeding, Seller, immediately upon learning thereof, shall give written notice to Purchaser. Thereafter, Purchaser shall have a period of thirty (30) days within which to elect, by written notice to Seller, to terminate the Agreement. In the event of such termination on or before Closing, all Earnest Money made pursuant to the Agreement shall be returned to Purchaser, and the Agreement shall become null and void. If no such election is timely made, Purchaser shall be deemed to have waived its rights under this paragraph, except that, if the transaction contemplated hereby closes, Purchaser shall be entitled to the proceeds or the right to negotiate, settle and collect the proceeds of such condemnation award, and Seller shall execute and deliver all documents reasonably requested of Seller in order to effectuate this section.

14.    **RISK OF LOSS.** Seller assumes all risks and liability for loss, damage, destruction or injury by fire, storm, accident or any other casualty to the Property from all causes until the Closing has been consummated. In the event of any material damage or destruction prior to Closing, Purchaser shall have the option exercisable by written notice to Seller within thirty (30) days after Purchaser is notified of such casualty, to terminate this Agreement by notice thereof to Seller, in which case the parties shall have no further rights or obligations under the Agreement and, in the event of such termination on or before Closing, all Earnest Money shall be returned to Purchaser; or Purchaser may elect to close this transaction and, in such event Purchaser shall be entitled to receive the full amount of any proceeds of such insurance payable on account of loss, damage or destruction after the date hereof and Seller shall be liable for the payment to Purchaser of all deductibles under applicable insurance policies. Seller covenants to execute such assignments, drafts and other instruments as may be required to effectuate this section.

15.    **APPLICATION OF EARNEST MONEY AND REMEDIES UPON DEFAULT.**

(a)    <u>Earnest Money</u>. Upon the Closing of the purchase and sale hereunder, the Earnest Money shall be applied to and credited toward the Purchase Price.

(b)    <u>Seller Default</u>. If the purchase and sale hereunder are not closed by reason of Seller's default hereunder, Purchaser shall have all rights at law or in equity, including the right to (i) specific performance of this Agreement or (ii) terminate this Agreement and receive a refund of the Earnest Money.

(c)    <u>Purchaser Default</u>. If the purchase and sale hereunder are not closed by reason of Purchaser's material default hereunder, then, as full liquidated damages for such default by Purchaser, the Earnest Money shall be immediately paid to Seller. It is specifically understood and agreed that payment of the Earnest Money to Seller, as liquidated damages, shall be Seller's sole and exclusive remedy hereunder, and Seller is hereby specifically waiving and relinquishing any and all other remedies at law or in equity. The parties acknowledge that the actual amount of the damages which Seller would sustain as a result of Purchaser's breach of this Agreement are difficult or impossible to estimate and that the payment of Earnest Money to Seller represents the parties' best estimate of Seller's damages in the event of such breach and is not to be construed as a penalty or forfeiture. The said stipulated sum is a reasonable pre-estimate of the probable loss resulting from such a breach.

SGR\13977SGR\1397714.95.005

16.    **BROKERAGE.** Seller and Purchaser each represent and warrant to the other that neither has employed, retained or consulted any broker, agent, consultant, or finder in carrying on the negotiations in connection with this Agreement or the purchase and sale referred to herein, and Seller and Purchaser shall each indemnify and hold the other harmless from and against any and all claims, demands, causes of action, debts, liabilities, judgments and damages (including costs and reasonable attorneys' fees incurred in connection with the enforcement of this indemnity) which may be asserted or recovered against the indemnitor's breach of this representation and warranty. The indemnity in this Paragraph shall survive the Closing or any termination of this Agreement.

17.    **MISCELLANEOUS.**

(a)    Assignment. Purchaser shall obtain Seller's consent, which such consent shall not be unreasonably withheld, prior to assigning Purchaser's rights in this Agreement; provided, however, Purchaser may assign Purchaser's rights in this Agreement to an affiliated entity of Purchaser without the consent of Seller.

(b)    Notices. Any notice, consent, approval, waiver, and election which any party shall be required or permitted to make or give under this contract shall be in writing and shall be deemed to have been sufficiently made or given if delivered by hand, courier, telecopier, certified mail, or overnight delivery service (such as Federal Express or United Parcel Service), addressed to the respective parties at the addresses below:

TO SELLER:    Leonard M. Ross
1011 N. Beverly Drive
Beverly Hills, California 90210
Phone: 310-271-9660
Fax: 310-271-9662

Lodgeco Properties, Ltd.
1011½ North Beverly Drive
Beverly Hills, CA 90210
Phone: 310-271-9660
Fax: 310-271-9662

CHSC, Ltd.
1011½ North Beverly Drive
Beverly Hills, CA 90210
Phone: 310-271-9660
Fax: 310-271-9662

Rossco Holdings Incorporated
Administrative Branch Office
1011½ North Beverly Drive
Beverly Hills, CA 90210
Phone: 310-271-9660
Fax: 310-271-9662

SGR\13977SGR\1397714.95.005

WITH A COPY TO:    David Giles
10440 North Central Expressway
Suite 1030
Dallas, Texas 75231
Phone: (214) 696-8802 Direct
Fax: 214-242-3816 (Fax)


TO PURCHASER:    PMH Acquisition, LLC
Two Live Oak Center
3445 Peachtree Rd. NE
Suite 1400
Atlanta, Georgia 30326
Attn: Cecil Phillips
Phone: 404/495-7521
Fax: 404/495-7523

PMH Acquisition, LLC
Two Live Oak Center
3445 Peachtree Rd. NE
Suite 1400
Atlanta, Georgia 30326
Attn: Mario Spinella
Phone: 404/495-7642
Fax: 404/495-7643

WITH A COPY TO:    Smith, Gambrell & Russell, LLP
Suite 3100, Promenade II
1230 Peachtree Street, N. E.
Atlanta, Georgia 30309
Attn: Malcolm D. Young, Jr., Esq.
Phone: 404/815-3774
Fax: 404/685-7074


Such notices shall be deemed received upon delivery when delivered by hand, by courier or by overnight delivery service. Each notice given by telecopy shall be deemed given on the date shown on the sender's copy thereof or confirmation notice showing date, time of transmission and number of pages transmitted. In the event that the telecopy transmission to the above facsimile phone number fails for any reason, said notice shall be deemed given on the date shown on the sender's copy thereof or confirmation notice showing date and time of attempted transmission, so long as the sender makes reasonable efforts thereafter to deliver such notice. Refusal to accept, or inability to deliver because of changed address of which no notice was given, shall be deemed receipt on the date of such refusal of delivery or inability to deliver.

11

SGR\13977SGR\1397714.95.005

Either party may, from time to time, change the address to which notices shall be sent by like notice given to the other party hereto, except that no party may change its address to other than a street address.  Any notice given that does not conform to this paragraph shall be effective only upon receipt.

(c)    Entire Agreement.  This Agreement, with the exhibits attached hereto, constitutes the entire agreement between Seller and Purchaser, and there are no other covenants, agreements, promises, terms, provisions, conditions, undertakings, or understandings, either oral or written, between them concerning the Property other than those herein set forth.  No subsequent alteration, amendment, change, deletion or addition to this Agreement shall be binding upon Seller or Purchaser unless in writing and signed by both Seller and Purchaser.

(d)    Headings.  The headings, captions, numbering system, etc., are inserted only as a matter of convenience and may not be considered at interpreting the provisions of the Agreement.

(e)    Binding Effect.  All of the provisions of this Agreement are hereby made binding upon the personal representatives, heirs, successors, and assigns of all parties hereto.

(f)    Time of Essence.  Time is of the essence of this Agreement.

(g)    Unenforceable or Inapplicable Provisions.  If any provision hereof is for any reason unenforceable or inapplicable, the other provisions hereof will remain in full force and effect in the same manner as if such unenforceable or inapplicable provision had never been contained herein.

(h)    Counterparts.  This Agreement may be executed in any number of counterparts, each of which will for all purposes be deemed to be an original, and all of which are identical.

(i)    Facsimile Signature.  A signature transmitted by facsimile transmission shall be effective between the parties.

(j)    Applicable Law, Place of Performance.  This Agreement shall be construed under and in accordance with the laws of the state in which the Property is located.

(k)    Purchaser's Waiver of Conditions Precedent.  Purchaser may, at Purchaser's sole option, elect to waive any of the conditions precedent to Purchaser's performance specified herein by giving written notice of such election to Seller at any time on or before the Closing Date.

(l)    Survival Clause.  The representations, warranties and covenants contained herein shall not merge in the deed or any other document and shall survive the Closing.

(m)    Construction.  The parties acknowledge that each party and its counsel have reviewed and approved this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or exhibits hereto.

12

SGR\13977SGR\1397714.95.005

(n)    <u>Business Days</u>. If the final day of any period or any date of performance under this Agreement falls on a Saturday, Sunday or legal holiday, then the final day of the period or the date of performance shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

(o)    <u>Telecopies</u>. The parties hereto agree that documents transmitted by telecopy or facsimile transmission shall be deemed to be written instruments and shall be binding on the parties executing and delivering such documents.

(p)    <u>Purchase Price Allocation</u>. Allocation of the Purchase Price as part of the distribution of closing funds following the Closing by and among Lodgeco, CHSC and Rossco and shall be a matter with which Purchaser is not to be concerned.

(q)    <u>Tax Free Exchange Program</u>. Seller shall have the right to effect a tax free exchange under Section 1031 of the Internal Revenue Code and Purchaser shall cooperate with Seller with regard thereto; provided, however, that Purchaser shall not incur any additional costs, expense or liability pertaining thereto. Seller shall have the right to assign this Agreement to an intermediary to effect an exchange. Purchaser shall have the right to reasonably comment upon any documents requiring Purchaser's signature.

18.    **OTHER DEVELOPMENT ISSUES.**

(a)    <u>Signage</u>. In the event that Purchaser has not terminated this Agreement, Purchaser shall have the right, at its sole cost and expense, to erect one prominently located sign on the Property no earlier than 120 days following the date of this Agreement, which sign shall announce the development of the Property proposed by Purchaser and the parties involved in connection with the proposed development. Such signage shall be subject to the consent of the Property owner's association, which consent shall not be unreasonably withheld, conditioned or delayed, and shall comply with all applicable laws and regulations.

(b)    <u>Seller's Obligations</u>. As a material part of the consideration for Purchaser's purchase of the Property, Seller hereby agrees that on or before the Closing, Seller shall have the obligation of diligently pursuing the satisfaction of the following (each of the following items, collectively, **"Seller's Obligations"**):

(i)    <u>Intentionally Omitted</u>.

(ii)    <u>Tenant Removal from the Property</u>. Purchaser and Seller each acknowledge that there are currently tenants on the Property occupying certain improvements pursuant to residential leases (the **"Tenant Leases"**). Seller hereby represents that there are no written or verbal leases other than those Tenant Leases listed in the rent roll attached hereto as **Exhibit "C"** (the **"Rent Roll"**). All existing Tenant Leases are on the Lease Form attached hereto as **Exhibit "D"** (the **"Lease Form"**). The Rent Roll, together with the Lease Form, is correct, complete, and accurately reflects the terms of all existing leases, including the lease termination terms of all Tenant Leases executed prior to the date of this Agreement. All leases executed as of or after the date of this Agreement will be on the Lease Form (any such new lease, a **"New Lease"**). No New Lease, or any renewal of any existing Tenant Leases, shall require greater than 30 days

13                                    SGR\13977SGR\1397714.95.005

written notice to terminate. Notwithstanding anything herein to the contrary, Seller shall terminate all Tenant Leases on or before closing and Seller shall be responsible to deliver the Property free and clear of all Tenant Leases, tenants, or other occupants of the Property at Closing. Seller hereby agrees to indemnify Purchaser and to hold purchaser harmless from any and all costs, damages, liabilities, or expenses related to the Tenant Leases, which indemnification shall survive closing. In the event that Seller fails to deliver the Property free of such Tenant Leases or occupants, the Purchaser may either (i) waive this contingency, take an assignment of Seller's interest of any and all Tenant Leases, and proceed to Closing, (ii) terminate this Agreement and receive a full refund of the Earnest Money, or (iii) exercise any of Purchaser's other rights as set forth herein.

(c)    Intentionally Omitted.

(d)    Joint Access Easement. Purchaser and Seller (the "**Parties**") hereby agree that as a material part of this transaction, the Parties shall enter into a joint use access easement (the "**Joint Access Easement**"), in order that Purchaser may access the Property from University Drive over Meadowland Street, which street is currently owned by Seller, and that following the Closing, Seller may access adjacent property (the "**Adjacent Property**") currently owned by Seller by means of the Joint Access Easement as it crosses the Property. The Joint Access Easement shall include the following terms:

(i)    The Joint Access Easement shall give each of the Parties the non-exclusive right to use the cross-hatched area (the "**Joint Access Easement Area**") shown on the site plan (the "**Site Plan**") attached hereto as **Exhibit "E"** for pedestrian and vehicular access. Seller shall grant the easement to Purchaser for the portion of the Joint Access Easement Area marked "**Seller Owned Property**", and Purchaser shall grant the easement to Seller for the portion of the Joint Access Easement Area marked "**Purchaser Owned Property**." The Joint Access Easement Area shall be in the location shown on the Site Plan along Meadowland Street, and Seller shall not have any right to relocate or otherwise change the location of the Joint Access Easement Area.

(ii)    The Joint Access Easement shall include the right for each of Seller and Purchaser to install and maintain utilities within the Joint Access Easement Area to serve the Property and the Adjacent Property.

(iii)    The Joint Access Easement shall provide for reasonable construction and maintenance cost sharing between the Parties.

(iv)    The Joint Access Easement shall be affirmatively insured by Title Insurer, without exception, as an appurtenance to the Property (with respect to the Seller Owned Property) included as part of Purchaser's insured estate in the Title Commitment and the Parties shall each be obligated to obtain any necessary lien or lender subordinations in connection therewith.

(v)    The Joint Access Easement shall include the customary indemnities for such use.

(vi)    The parties agree to change the location of the Joint Access Easement Area as shown on **Exhibit "E"** in the event that Seller is able to provide to Purchaser

SGR\13977SGR\1397714.95.005

another acceptable location for such easement area satisfactory to Purchaser (in Purchaser's sole discretion) from the Property to University Drive.

(e)    Intentionally Omitted.

(f)    Site Plan and Elevations. Seller and Purchaser shall cooperate to design a mutually satisfactory site plan and elevations (the "**Project Design**") for the Project on or before 30 days following the date hereof. In the event that Seller and Purchaser fail to finalize the Project Design on or before the aforesaid 30 day period, then either of Seller or Purchaser shall deliver notice to the other indicated the specific objections to the proposed site plan and elevations, and Seller and Purchaser shall reasonably cooperate to address each of such objections on or before the expiration of the Inspection Period.

(g)    Place Properties parking structure shall be built and located closest to Hansel.

19.    **BANKRUPTCY COURT APPROVAL.**  Purchaser hereby acknowledges that under Section 363 of the Code, Seller has a fiduciary responsibility to maximize the value of the Property and that, pursuant to such responsibility, Purchaser hereby expressly agrees that Seller may solicit and receive *bona fide* bids for the Property from qualified third parties pursuant to the overbid procedures agreed to by Purchaser and Seller and approved by the Bankruptcy Court (the "*Overbid Procedures*"). The Seller shall propose and request that the Bankruptcy Court approve the following as part of the Overbid Procedures, but no such procedures shall be binding on Seller unless authorized and approved by the Bankruptcy Court.

(a)    Breakup Fee. If this Agreement is terminated because the Bankruptcy Court has approved an overbid pursuant to the Overbid Procedures and the Seller closes a sale with the successful overbidder, then the Seller shall pay to Purchaser a fee in the amount of $292,250.00 (the "*Breakup Fee*"). The payment of the Breakup Fee shall be made by wire transfer of immediately available funds promptly (but in any event within two (2) business days) following the closing of the sale with the successful overbidder and to the extent not paid to the Purchaser, will be granted super priority administrative expense status in the Seller's bankruptcy case payable out of the Seller's cash or other collateral securing the Seller's obligations (and which shall be senior to any and all claims of any creditors or equity holders of the Seller, including prepetition and postpetition amounts owing to the Seller's prepetition and/or postpetition senior secured lenders). In the event the closing with the successful overbidder does not occur, the Seller may proceed to close with the next highest overbidder, including the Purchaser. If the Seller closes with any overbidder, the Purchaser shall be entitled to a Breakup Fee. Closing with the next highest overbidder shall occur under the terms and conditions of the Overbid Procedures.

(b)    Minimum Overbids. The initial overbid over the Purchase Price shall be in an amount that is greater than the Purchase Price by at least fifty thousand dollars ($50,000.00) plus the Breakup Fee. All subsequent overbids shall be at least $100,000.00 over the immediate previous best offer. Purchaser shall have the right to submit an overbid in response to any initial overbid or subsequent overbids. Purchaser may include an amount equal to the Breakup Fee as cash consideration for purposes of any overbids by Purchaser. In no event shall an Overbid be accepted until such time as Purchaser has had a reasonable opportunity to submit an additional bid.

15                                    SGR\13977SGR\1397714.95.005

(c)    <u>Qualified Bid Submission</u>.  Qualified Bids should be submitted to Seller 3 days prior to the date of the Auction as provided in the Bid Procedures Order.

(d)    <u>Qualification to Overbid</u>.  All parties intending to bid on the Property at the Auction must submit a "***Qualified Bid***", which shall mean a written proposal provided to the Seller and Purchaser for the purchase of the Property by a potential bidder provided in accordance with the Bidding Procedures and that satisfies all the requirements set forth in the Bidding Procedures, including, without limitation, that any such proposal (a) does not contain any financing or due diligence contingencies beyond those contemplated by this Agreement, (b) is accompanied by a marked copy of this Agreement, which shall be the agreement pursuant to which such prospective purchaser proposes to acquire the assets sought to be acquired (proposals may not be for less than substantially all assets); (c) is accompanied by evidence of committed financing or other ability to perform; (d) is accompanied by a good-faith deposit equal to the Earnest Money Deposit and payable to the Seller; (e) is timely submitted by the bid deadline set forth in the Bidding Procedures Order and (f) that is accompanied by a letter stating that the bidder's offer is irrevocable until the earlier of (i) two business days after the Closing date of an alternative sale or sales approved by the Bankruptcy Court and (ii) forty-five days after the conclusion of the Sale Hearing.  This Agreement shall be deemed to be a Qualified Bid.

(e)    <u>Overbid Approval.</u>  The Seller or the secured creditor may dispute any overbid.

(f)    <u>Bankruptcy Court Approval</u>.

(i)    Within five (5) business days after the date of this Agreement, the Seller shall file its motion to approve the bidding procedures described in this Section 19 with the Bankruptcy Court (the "***Bidding Procedures Motion***"), together with appropriate supporting papers and notices, seeking the entry, within twenty (20) days of the filing of such motion, of an order seeking approval of the bidding procedures (the "***Bidding Procedures Order***").  The Bidding Procedures Motion and Bidding Procedures Order shall be in form and substance reasonably acceptable to the Purchaser.  Simultaneously with the filing of the Bidding Procedures Motion, the Seller shall file the Sale Motion with the Bankruptcy Court.

(ii)    The Seller shall use its commercially reasonable efforts to obtain entry of the Bidding Procedures Order no later than twenty (20) days after filing the Bidding Procedures Motion.

(iii)    The Bidding Procedures Order shall provide dates for bid deadline, the Auction and the hearing on the Sale Motion.

(iv)    In the event an appeal is taken or a stay pending appeal is requested, from either the Bidding Procedures Order or the Sale Order, the Seller shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser promptly a copy of the related notice of appeal or order of stay.  The Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.

16

(v)    From and after the date of this Agreement and to the extent Purchaser is the successful bidder at the Auction, the Seller shall not take any action that is intended, or fail to take any action the intent of which failure to act would result in the reversal, voiding, modification or staying of the Bidding Procedures Order or the Sale Order.

[SIGNATURES BEGIN ON NEXT PAGE]

17

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the date this Agreement has been signed by both Purchaser or Seller. All references to the "date of this Agreement", the "Effective Date", or similar references shall mean the date on which the later of Seller or Purchaser shall have executed this Agreement. Escrow Agent's signature below shall not affect the Effective Date of this Agreement.

SELLER:

LODGECO PROPERTIES, LTD.
By Rossco Holdings Incorporated, General Partner

By _____
Leonard M. Ross, President

CHSC, LTD.
By Rossco Holdings Incorporated, General Partner

By _____
Leonard M. Ross, President

ROSSCO HOLDINGS INCORPORATED

By _____
Leonard M. Ross, President

9/29/2010
Date of Final Execution


PURCHASER:

PMH ACQUISITION, LLC

By: _____
Cecil M. Phillips, Manager


October 5 2010
Date of Final Execution

SGR\13977\8GR\13977714.78.

SGR\13977714.9

The undersigned agrees to hold and disburse the
Earnest Money in accordance with this Agreement.

FIDELITY TITLE INSURANCE COMPANY

By: _____

Name: _____

Title: _____


Date: _____

SGR\13977SGR\1397714.95.005

**Exhibit "A"**

**LEGAL DESCRIPTION**

SGR\13977SGR\1397714.95.005



INDEPENDENCE PLACE
AT COLLEGE STATION
COLLEGE STATION, TEXAS
AUGUST 18, 2010

EXHIBIT "A"

SGR\13977SGR\1397714.95.005



THE FOLLOWING COMMITMENT FOR TITLE INSURANCE IS NOT VALID UNLESS
YOUR NAME AND THE POLICY AMOUNT ARE SHOWN IN SCHEDULE A, AND
OUR AUTHORIZED REPRESENTATIVE HAS COUNTERSIGNED BELOW.



**COMMITMENT FOR TITLE INSURANCE**
ISSUED BY

## FIDELITY NATIONAL TITLE INSURANCE COMPANY

We, FIDELITY NATIONAL TITLE INSURANCE COMPANY, a California corporation, will
issue our title insurance policy or policies (the Policy) to You (the proposed insured) upon
payment of the premium and other charges due, and compliance with the requirements in
Schedule B and Schedule C. Our Policy will be in the form approved by the Texas
Department of Insurance at the date of issuance, and will insure your interest in the land
described in Schedule A. The estimated premium for our Policy and applicable endorse-
ments is shown on Schedule D. There may be additional charges such as recording fees,
and expedited delivery expenses.

This Commitment ends ninety (90) days from the effective date, unless the Policy is
issued sooner, or failure to issue the Policy is our fault. Our liability and obligations to You
are under the express terms of this Commitment and end when this Commitment expires.

Issued by:
FIDELITY NATIONAL TITLE AGENCY, INC.
260 Three Lincoln Center, 5430 LBJ FWY
Dallas, TX 75240
Phone: (972)770-2121   Fax: (972)770-2112

Fidelity National Title Agency, Inc.

_Authorized Signature_

8/25/2010

*Fidelity National Title Insurance Company*

(SEAL)

By: _____ President

ATTEST _____ Secretary

FORM 1873
REPRINTED (01/00)

TEXAS FORM T-7: COMMITMENT FOR TITLE INSURANCE
Effective 1-1-93

EXHIBIT "A" CONTINUED

SGR\13977SGR\1397714.95.005

## CONDITIONS AND STIPULATIONS

1. If you have actual knowledge of any matter which may affect the title or mortgage covered by this Commitment, that is not shown in Schedule B, you must notify us in writing. If you do not notify us in writing, our liability to you is ended or reduced to the extent that your failure to notify us affects our liability. If you do notify us, or we learn of such matter, we may amend Schedule B, but we will not be relieved of liability already incurred.

2. Our liability is only to you, and others who are included in the definition of Insured in the Policy to be issued. Our liability is only for actual loss incurred in your reliance on this Commitment to comply with its requirements, or to acquire the interest in the land. Our liability is limited to the amount shown in Schedule A of this Commitment and will be subject to the following terms of the Policy: Insuring Provisions, Conditions and Stipulations, and Exclusions.

EXHIBIT "A" CONTINUED

SGR\13977SGR\1397714.95.005

FIDELITY NATIONAL TITLE INSURANCE COMPANY

## SCHEDULE A

Effective Date:   August 1, 2010 at 08:00 AM
GF Number:  FTDAL34-FT000002534501

Commitment Number:   FT000002534501,
issued August 25, 2010 at 8:00 a.m.

1.   The policy or policies to be issued are:

    (a)   OWNER'S POLICY OF TITLE INSURANCE (Form T-1)
        (Not applicable for improved one-to-four family residential real estate)
        Policy Amount: $13,000,000.00
        PROPOSED INSURED:
        TBD

    (b)   TEXAS RESIDENTIAL OWNER'S POLICY OF TITLE INSURANCE
        -- ONE-TO-FOUR FAMILY RESIDENCES (Form T-1R)
        Policy Amount:
        PROPOSED INSURED:

    (c)   LOAN POLICY OF TITLE INSURANCE (Form T-2)
        Policy Amount:
        PROPOSED INSURED:
        Proposed Borrower:

    (d)   TEXAS SHORT FORM RESIDENTIAL LOAN POLICY OF TITLE INSURANCE (Form T-2R)
        Policy Amount:
        PROPOSED INSURED:
        Proposed Borrower:

    (e)   LOAN TITLE POLICY BINDER ON INTERIM CONSTRUCTION LOAN (Form T-13)
        PROPOSED INSURED:
        Binder Amount:
        Proposed Borrower:

    (f)   OTHER
        Policy Amount:
        PROPOSED INSURED:
        Proposed Borrower:

2.   The interest in the land covered by this Commitment is:

    Fee Simple

3.   Record title to the land on the Effective Date appears to be vested in:

    Lodgeco Properties, Ltd., a Texas Limited Partnership - Tracts 3 and 4

    Rossco Holdings, Incorporated, a California Corporation - Tracts 4, 6, 7, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, and 22

4.   Legal description of land:

    TRACT ONE: Intentionally Deleted

    TRACT TWO: Intentionally Deleted

    TRACT THREE:

    Lots Six (6), Seven (7), Eight (8), Nine (9), Ten (10), Eleven (11), Twelve (12), Thirteen (13), Fourteen (14), Fifteen (15) and Sixteen (16), Meadowland Addition, City of College Station, according to plat thereof recorded in Volume 94, Page 278 of the Deed Records of Brazos County, Texas.

FORM T-7: Commitment for Title Insurance
(Schedule A)

## EXHIBIT "A" CONTINUED

SGR\13977SGR\1397714.95.005

GF Number:  FTDAL34-FT000002534501                          Commitment Number:  FT000002534501

TRACT FOUR:

Lot Two (2), Lodgeco Subdivision, City of College Station, according to plat thereof recorded in Volume 1996, Page 331 of the Official Records of Brazos County, Texas.

TRACT FIVE: Intentionally Deleted

TRACT SIX:

Lot Eighteen (18), Meadowland Addition, City of College Station, according to plat thereof recorded in Volume 94, Page 278 of the Deed Records of Brazos County, Texas.

TRACT SEVEN:

Lot Seventeen (17), Meadowland Addition, City of College Station, according to plat thereof recorded in Volume 94, Page 278 of the Deed Records of Brazos County, Texas.

TRACT EIGHT: Intentionally Deleted

TRACT NINE:

Lot Nineteen (19), Meadowland Addition, City of College Station, according to plat thereof recorded in Volume 94, Page 278 of the Deed Records of Brazos County, Texas.

TRACT TEN: Intentionally Deleted

TRACT ELEVEN:

Lot Two (2), North Park Section II, City of College Station, according to plat thereof recorded in Volume 494, Page 543 of the Deed Records of Brazos County, Texas.

TRACT TWELVE:

Lot Three (3), North Park Section II, City of College Station, according to plat thereof recorded in Volume 494, Page 543 of the Deed Records of Brazos County, Texas.

TRACT THIRTEEN:

Lot Ten (10), Block Two (2), North Park, City of College Station, according to plat thereof recorded in Volume 465, Page 37 of the Deed Records of Brazos County, Texas.

TRACT FOURTEEN

Lot Four (4), North Park Section II, City of College Station, according to plat thereof recorded in Volume 494, Page 543 of the Deed Records of Brazos County, Texas.

TRACT FIFTEEN:

Lot Nine (9), Block Two (2), North Park, City of College Station, according to plat thereof recorded in Volume 465, Page 37 of the Deed Records of Brazos County, Texas.

TRACT SIXTEEN:

Lot Five (5), North Park Section II, City of College Station, according to plat thereof recorded in Volume 494, Page 543 of the Deed Records of Brazos County, Texas.

FORM T-7: Commitment for Title Insurance
(Schedule A)

EXHIBIT "A" CONTINUED

SGR\13977SGR\1397714.95.005

GF Number:  FTDAL34-FT000002534501                    Commitment Number:  FT000002534501

TRACT SEVENTEEN:

Lot Seven (7), Block Two (2), North Park, City of College Station, according to plat thereof recorded in Volume
465, Page 37 of the Deed Records of Brazos County, Texas.

~~TRACT EIGHTEEN:~~

Lot Eight (8), Block Two (2), North Park, City of College Station, according to plat thereof recorded in Volume 465,
Page 37 of the Deed Records of Brazos County, Texas.

~~TRACT NINETEEN:~~

Lot Five (5), Block Two (2), North Park, City of College Station, according to plat thereof recorded in Volume 465,
Page 37 of the Deed Records of Brazos County, Texas.

TRACT TWENTY:

Lot Six (6), Block Two (2), North Park, City of College Station, according to plat thereof recorded in Volume 465,
Page 37 of the Deed Records of Brazos County, Texas.

TRACT TWENTY-ONE:

Lot Three (3), Block Two (2), North Park, City of College Station, according to plat thereof recorded in Volume 465,
Page 37 of the Deed Records of Brazos County, Texas.

~~TRACT TWENTY-TWO:~~

Lot Four (4), Block Two (2), North Park, City of College Station, according to plat thereof recorded in Volume 465,
Page 37 of the Deed Records of Brazos County, Texas.

TRACT TWENTY-THREE: Intentionally Deleted

TRACT TWENTY-FOUR: Intentionally Deleted

TRACT TWENTY-FIVE: Intentionally Deleted

NOTE:  COMPANY DOES NOT REPRESENT THAT THE ABOVE ACREAGE AND/OR SQUARE FOOTAGE
CALCULATIONS ARE CORRECT.

FORM T-7: Commitment for Title Insurance
(Schedule A)

**EXHIBIT "A" CONTINUED**

SGR\13977SGR\1397714.95.005

## Exhibit "B"

## EARNEST MONEY ESCROW AGREEMENT

### RECITALS

Seller and Purchaser have entered into a certain purchase agreement ("Purchase Agreement") concerning real property.

In connection with the Purchase Agreement, Seller and Purchaser have requested Escrow Agent to receive funds to be held in escrow and applied in accordance with the terms and conditions of this Escrow Agreement.

NOW THEREFORE, in consideration of the above recitals, the mutual promises set forth herein and other good and valuable consideration, the parties agree as follows:

1.      Escrow Agent hereby agrees to act as Escrow Agent in accordance with the terms and conditions of this Purchase and Sale Agreement.

2.      INITIAL DEPOSIT/ADDITIONAL DEPOSITS. Escrow Agent shall receive an initial deposit as set forth in the Purchase and Sale Agreement between the above parties. Any additional amounts deposited with Escrow Agent shall be added to the initial deposit and together with the initial deposit shall be referred to herein collectively as the "Escrow Fund".

3.      DEPOSITS OF FUNDS. All checks, money orders or drafts will be processed for collection in the normal course of business. Escrow Agent may commingle funds received by it in escrow with escrow funds of others, and may, without limitation, deposit such funds in its custodial or escrow accounts with any reputable trust company, bank, savings bank, savings association, or other financial services entity. It is understood that Escrow Agent shall be under no obligation, except to the extent instructed in writing by Seller and/or Purchaser, to invest the funds deposited with it on behalf of any depositor, nor shall it be accountable for any earnings or incidental benefit attributable to the funds which may be received by Escrow Agent while it holds such funds. Deposits held by Escrow Agent shall be subject to the provisions of applicable state statues governing unclaimed property. If Seller and Purchaser instruct Escrow Agent to deposit the Escrow Fund in an interest-bearing account, upon the depository institution's request, the Seller and/or Purchaser will execute the appropriate Internal Revenue Service documentation for the giving of taxpayer identification information relating to this account. Interest will accrue on said account at the rate provided by the institution in which the escrowed funds are deposited. The Seller and/or Purchaser are aware the Federal Deposit Insurance Corporation (FDIC) coverages apply to a maximum amount of $100,000.00 per depositor (as may be modified by the FDIC from time to time). Further, the Seller and/or Purchaser do not and will not hold Escrow Agent liable for any loss occurring which arises from bank failure or error, insolvency or suspension, or a situation or event which falls under the FDIC coverages.

All interest will accrue to and be reported to the Internal Revenue Service for the account of:

Name: _____

Address: _____

_____

Phone: _____

Tax Identification or Social Security No.: _____

Escrow Agent shall not be responsible for any penalties, or loss of principal or interest, or any delays in the withdrawal of the funds which may be imposed by the depository institution as a result of the making or redeeming of the investment pursuant to Seller and/or Purchaser instructions.

4.      DISBURSEMENT OF ESCROW FUND. Escrow Agent may disburse all or any portion of the Escrow Fund in accordance with and in reliance upon the terms and conditions of the Purchase Agreement or upon written instructions from both Seller and Purchasers, provided however, in the event Purchaser elects to terminate this Agreement on or before the expiration of the Inspection Period, Escrow Agent shall automatically release the Escrow Fund and Earnest Money to Purchaser without any further act, consent, approval, or release by Seller. The Escrow Agent shall have no responsibility to make an investigation or determination of any facts underlying such instructions or as to whether any conditions upon which the funds are to be released have been fulfilled or not fulfilled, or to whom funds are released.

5.      DEFAULT AND/OR DISPUTES. In the event any party to the transaction underlying this Agreement shall tender any performance after the time when such performance was due, Escrow Agent may proceed under this Agreement unless one of the parties to this Agreement shall give to the Escrow Agent written direction to stop further performance of the Escrow Agent's functions hereunder. In the event written notice of default or dispute is given to the Escrow Agent by any party, or if Escrow Agent receives contrary written instructions from any party, the Escrow Agent will promptly notify all parties of such notice. Thereafter, Escrow Agent will decline to disburse funds or to deliver any instrument or otherwise continue to perform its escrow functions, except upon receipt of a mutual written agreement of the parties or upon an appropriate order of court. In the event of a dispute, the Escrow Agent is authorized to deposit the escrow into a court of competent jurisdiction for a determination as to the proper disposition of said funds. In the event that the funds are deposited in court, the Escrow Agent shall be entitled to file a claim in the proceeding for its costs and counsel fees, if any.

6.      ESCROW AGENT FEES AND OTHER EXPENSES. Escrow Agent shall charge for its services hereunder in accordance with its current schedule of fees (which includes annual maintenance fees) unless otherwise provided. Unless otherwise directed, such fees shall be charged to the Purchaser and Seller equally. All fees, charges and expenses are due and payable at settlement and such amounts may be deducted by Escrow Agent from any funds held in escrow due to the party from whom such amounts are due and owing. Additional amounts which may become due for any reason shall be promptly paid to Escrow Agent by the party owing such amounts. Escrow Agent shall not be required to advance its own funds for any purpose provided that any such advance, made at its option, shall be promptly reimbursed by the party for whom it is advanced, and such optional advance shall not be an admission of liability on the part of Escrow Agent.

7.      PERFORMANCE OF DUTIES. In performing any of its duties under this Agreement, or upon the claimed failure to perform its duties hereunder, Escrow Agent shall not be liable to anyone for any damages, losses or expenses which may occur as a result of Escrow Agent so acting, or failing to act; provided, however, Escrow Agent shall be liable for damages arising out of its willful default or gross negligence under this Agreement. Accordingly, Escrow Agent shall not incur any such liability with respect to (i) any good faith act or omission upon advice of counsel given with respect to any questions relating to the duties and responsibilities of Escrow Agent hereunder, or (ii) any good faith act or omission in reliance upon any document, including any written notice or instructions provided for in the Agreement, not only as to its due execution and to the validity and effectiveness of its provisions but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the proper person or persons and to conform with the provisions of this Agreement.

8.      HOLD HARMLESS. Purchaser and Seller shall indemnify the Escrow Agent and hold the Escrow Agent harmless from all damage, costs, claims and expenses arising from performance of its duties as Escrow Agent including reasonable attorneys' fees, except for those damages, costs, claims and expenses resulting form the gross negligence or willful misconduct of the Escrow Agent.

9.      TERMINATION. This Agreement shall terminate upon the first to occur of ( a ) three years from the date hereof, in which event Escrow Agent shall disburse the Escrow Fund to the person who deposited such funds, less Escrow Agent's fees and expenses, unless this Agreement is extended by written agreement of all parties including the Escrow Agent; ( b ) the disbursement by Escrow Agent of all of the Escrow Fund; ( c ) the joint written instructions of Purchaser and Seller; ( d ) the resignation of Escrow Agent upon reasonable notice to Purchaser and Seller and the transfer of the Escrow Fund to their designated replacement Escrow Agent.

10.     RELEASE OF PAYMENT. Payment of the funds so held in escrow by the Escrow Agent, in

28

accordance with the terms, conditions and provisions of this Escrow Agreement, shall fully and completely discharge and exonerate the Escrow Agent from any and all future liability or obligations of any nature or character at law or equity to the parties hereto or under this Agreement.

11.    NOTICES.

**Seller:**  _____, LLC
Address:_____
Fax:    _____

**Purchaser**: PMH Acquisition, LLC
Address:_____
Fax:    _____

To **Escrow Agent:**

_____
_____
_____
_____

12.    This Agreement shall be binding upon and inure to the benefit of the parties' respective successors and assigns.

13.    This Agreement shall be governed by and construed in accordance with the Laws of the State of where the Property is located.

SGR\13977SGR\1397714.95.005

**Exhibit "C"**

Rent Roll (Attached)

SGR\1397714.9

**Meadowland Apartments**
133 Meadowland Street #D
College Station, TX 77840

September 3, 2010

133M
Select 09/03/2010
60 APTS, 31704 Sq. Ft.
Rent Roll as of 9/3/2010

| Apt. | Type | Apt. Status | Name | Sq. Ft. | Market Rent | Code | Lease Charges | Gross Possible | Actual Periodled Charges | M/I Date M/O Date | Lease Expires Term | Sec/Other Deposit |
|------|------|-------------|------|---------|-------------|------|---------------|----------------|--------------------------|-------------------|--------------------|-------------------|
| 133A | 1x1 w FP | OC | Rudolph Seller | 525 | 495.00 | RENT | $225.00 | $595.00 | $  | 1/18/2010 | 11/30/2010 | $150.00 |
| 141C | 2x1 | OC | Nischal Kafle | 598 | $375.00 | RENT | $375.00 | $375.00 | $ | 8/1/2010 | 5/31/2011 | $150.00 |

31

SGR\13977SGR\1397714.95.005

**Exhibit "D"**

Lease Form (Attached)

03/03/2010  11:18    9797647768    COLONY    PAGE  05/16

**TEXAS APARTMENT ASSOCIATION**

## Apartment Lease Contract

Date of Lease Contract __12-22-09__
(when this Lease Contract is filled out)

This is a binding contract. Read carefully before signing.

### Moving In — General Information

1. **PARTIES.** This Lease Contract is between you, the resident(s) listed below, and us, the owner:

   __Rudolph Seiler__

   and us, the owner:

   __RCSK Management__

   (name of apartment community or title holder). You've agreed to rent Apartment No. __133A__ at __Meadowland Street__ (street address) in __College Station__ (city), __77840__ (zip).

   Term. The term "you" and "your" refer to all residents listed above, and a person authorized to act in the event of a resident's death. The terms "we," "us," and "our" refer to the owner listed above and not to property managers or anyone else. Written notice to or from our managers constitutes notice to or from us. If anyone else has guaranteed performance of this Lease Contract, a separate Lease Contract Guaranty for each guarantor must be executed.

2. **OCCUPANTS.** The apartment will be occupied only by you and (list all other occupants not signing the Lease Contract):

   __Joseph Seiler (06-09-88)__

   No one else may occupy the apartment. Persons not listed above must not stay in the apartment for more than ___ consecutive days without our prior written consent, and no more than twice that many days in any one month. If the previous space isn't filled in, two days per month is the limit.

3. **LEASE TERM.** The initial term of the Lease Contract begins on the __18__ day of __January__, __2010__ (month), and ends at midnight the __31__ day of __May__ __2010__ (year). This Lease Contract will automatically renew month-to-month unless either party gives at least ___ days written notice of termination or intent to move-out as required by paragraph 37. If the number of days isn't filled in, at least 30 days notice is required.

4. **SECURITY DEPOSIT.** The total security deposit for all residents is __150__, due on or before the date this Lease Contract is signed. This amount (check one): ☐ does or ☐ does not include an animal deposit. Any animal deposit will be stated in an animal addendum. See paragraphs 41 and 42 for security deposit return information.

5. **KEYS, FURNITURE AND AFFIDAVIT OF MOVE-OUT.** You will be provided __2__ apartment key(s), __0__ mailbox key(s), and __0__ other access devices for ___. Any unit... or spouse who, according to a remaining resident's affidavit, has permanently moved out or is deceased (under the terms of the apartment, or (at our option) no longer entitled to occupancy, keys, or other access devices. Your apartment will be ☐ furnished or ☐ unfurnished.

6. **RENT AND CHARGES.** You will pay $__5950__ per month for rent, in advance and without demand:
   ☐ at the onsite manager's office
   ☐ through our online payment site
   ☐ at ___

   Prorated rent of $__897.60__ is due for the remainder of (check one): ☐ 1st month or ☐ 2nd month.

   Otherwise, you must pay your rent on or before the 1st day of each month (due date) with no grace period. Cash is unacceptable without our prior written permission. You must not withhold or offset rent unless authorized by statute. We may, at our option, require at any time that you pay all rent and other money due in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. If you don't pay all rent on or before the __5th__ day of the month and we haven't given notice to vacate for the previous month before rent is due, you'll pay an initial late charge of $__50__ plus a daily late charge of $___ per day after that date until paid in full. Daily late charges can't exceed 15 days for any single month's rent. We will not impose late charges until at least the third day of the month. You'll also pay a charge of $__35.00__ for each returned check or rejected electronic payment, plus initial and daily late charges until we receive acceptable payment. If you don't pay rent on time, you'll be in default and all remedies under this Lease Contract will be authorized. If you violate the animal restrictions of paragraph 27 or other animal rules, you'll pay an initial charge of $__150.00__ per animal (not to exceed $100 per animal) and a daily charge of $__10.00__ per animal (not to exceed $10 per day per animal) from the date the animal was brought into your apartment until it is finally removed. We'll also have all other remedies for such violation.

7. **UTILITIES.** We'll pay for the following items, if checked: ☐ gas ☐ water ☐ wastewater ☐ electricity ☐ trash ☐ cable TV ☐ master antenna ☐ other utilities ___.
   You'll pay for all other utilities, related deposits, and any charges or fees on such utilities during your Lease Contract term...

8. **INSURANCE.** Our insurance does not cover the loss of or damage to your personal property. You (check one): ☐ are required to buy and maintain renter's or liability insurance (see attached addendum), or ☐ are not required to buy renter's or liability insurance...

9. **SECURITY DEVICES.** What We Must Provide...

10. **SPECIAL PROVISIONS.** The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease Contract and will supersede any conflicting provisions of this printed Lease Contract form.

   __A pet addendum for a less than__
   __60 lbs dog with a $300 pet__
   __deposit will be added to this__
   __contract.__

11. **UNLAWFUL EARLY MOVE-OUT RELETTING CHARGE.** You'll be liable for a reletting charge of $__2505.00__ (not to exceed 85% of the highest monthly rent during the Lease Contract term) if you:
    (1) fail to move in, or fail to give written move-out notice as required in paragraphs 23 or 37; or
    (2) move out without paying rent in full for the entire Lease Contract term or renewal period; or
    (3) move out at our demand because of your default; or
    (4) are judicially evicted.
    The reletting charge is not a cancellation fee and does not release you from your obligations under this Lease Contract. See the final paragraph of page 3.

SGR\13977SGR\1397714.95.005

Not a Release. The relating charge is not a Lease Contract cancellation or buyout fee. It is a liquidated amount covering only part of our damages; that is, our time, effort, and expense in finding and processing a replacement. These damages are uncertain and difficult to ascertain—particularly those relating to make-ready, inconvenience, paperwork, advertising, showing apartments, utilities for showing, checking prospects, overhead, marketing costs, and locator-service fees. You agree that the relating charge is a reasonable estimate of such damages and that the charge is due whether or not our relating attempts succeed. If an amount is stipulated, you need pay any actual relating costs so far as they can be ascertained. The relating charge does not release you from continued liability for: future or past-due rent; charges for cleaning, repairing, repainting, or unreturned keys, or other sums due.

**12. DAMAGES AND REIMBURSEMENT.** You must promptly pay or reimburse us for loss, damage, consequential damages, government fines or charges, or cost of repairs or service in the apartment community due to a violation of the Lease Contract or rules; improper use; negligence; other conduct by you or your invitees, guests or occupants; or any other cause not due to our negligence or fault. You will indemnify and hold us harmless from all liability arising from the conduct of you, your invitees, guests, or occupants, or our representatives who perform at your request services not contemplated in this Lease Contract. Unless the damage or wastewater stoppage is due to our negligence, we're not liable for—and you won't pay for—repairing, replacing, or damage to the following: (1) any wastewater stoppage in lines exclusively serving your apartment, (2) damages from windows or doors left open, and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment. We may require payment at any time, including advance payment of repairs for which you're liable. Delay in demanding sums you owe is not a waiver.

**13. CONTRACTUAL LIEN AND PROPERTY LEFT IN APARTMENT.** All property in the apartment is subject to a contractual lien to secure payment of delinquent rent (except as exempted by Texas Property Code). This contractual lien attaches to everything except what is exempt under Section 54.042, Texas Property Code. For rent not guaranteed by beginning our rental obligations.

Removal After the lien becomes due. If your rent is delinquent, our representative may peacefully enter the apartment and remove and/or store all property subject to lien. Written notice of entry must be left afterwards in the apartment in a conspicuous place—plus a list of items removed. The notice must state the amount of delinquent rent and the name, phone number of the person to contact about the amount owed. The notice must also state that the property will be promptly returned when the delinquent rent is fully paid. All property in the apartment is presumed to be yours unless proven otherwise.

Removal After Surrender, Abandonment, or Eviction. We or law officers may remove or store all property remaining in the apartment or in common areas (including any vehicles you or any occupant or guest owns or uses) if you are judicially evicted or if you surrender or abandon the apartment (see definition in paragraph 42).

Storage. We will store property removed under a contractual lien. We may, but have no duty to, store property removed after judicial eviction, surrender, or abandonment of the apartment. We're not liable for casualty loss, damage, or theft except for property removed under a contractual lien. You must pay reasonable charges for our packing, removing, storing, and selling any property. We have a lien on all property removed and stored after surrender, abandonment, or judicial eviction for all sums you owe, with one exception: Our lien on property listed under Texas Property Code Section 54.042 is limited to charges for packing, removing, and storing.

Redemption. If we've removed and stored property under a contractual lien but have not authorized its sale, you may redeem the property by paying all delinquent rent due at the time of seizure. But if notice of late fees forth or following is given before you seek redemption, you may redeem only by paying the delinquent rent and reasonable charges for packing, removing, and storing. If we've removed and stored property after surrender, abandonment, or judicial eviction, you may redeem only by paying all sums you owe, including rent.

**18. COMMUNITY POLICIES OR RULES.** You and all guests and occupants must comply with any written apartment rules and community policies, including instructions for care of our property. Our rules are considered part of this Lease Contract. We may make reasonable changes to written rules, effective immediately, if they are distributed and applicable to all units in the apartment community and do not change dollar amounts on page 1 of this Lease Contract.

**19. LIMITATIONS ON CONDUCT.** The apartment and other areas reserved for your private use must be kept clean. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care in accordance with apartment rules and posted signs. Glass containers are prohibited in or near pools and all other common areas. You, your occupants, or guests may use balconies, patios, or in the apartment community use outdoors or on balconies or railings without our prior written approval; cook on balconies or grounds; or solicit business or membership. Conducting any kind of business (including child care services) in your apartment or in the apartment community is prohibited—except that any lawful

Apartment Lease Contract  © 2003 Texas Apartment Association, Inc.

A.W.K.

late charges, reletting charges, storage, damages, etc. We may return unclaimed property at the place of storage, the management office, or the apartment (at our option). We may require payment by cash, money order, or certified check.

Disposition or Sale. Except for animals and property removed after the death of a sole resident, we may throw away or give to a charitable organization all items of personal property that are: (1) left in the apartment after surrender or abandonment; or (2) left outside more than 1 hour after writ of possession is executed, following judicial eviction. Animals removed after surrender, abandonment, or eviction may be kenneled or turned over to a local humane society or humane authority. Property thrown away or given to charity may be disposed of only by sale, which must be held no sooner than 30 days after written notice of date, time, and place of sale is sent by both regular mail and certified mail (return receipt requested) to your last known address. The notice must itemize the amounts you owe and the name, address, and phone number of the person to contact about the account; the amount owed; and your right to redeem the property. Sale may be public or private; is subject to any third-party ownership or lien claims; must be to the highest cash bidder; and may be in bulk, in batches, or item-by-item. Proceeds exceeding sums owed must be mailed to you at your last known address within 30 days after sale.

**14. FAILING TO PAY FIRST MONTH'S RENT.** If you don't pay the first month's rent when or before the Lease Contract begins, all future and other automatically accelerated without notice and immediately due. We also may end your right of occupancy and recover damages, future rent, reletting charges, attorney's fees, court costs, and other lawful charges. Our rights, remedies, and duties under paragraphs 11 and 32 apply to acceleration.

**15. RENT INCREASES AND LEASE CONTRACT CHANGES.** No rent increases or Lease Contract changes are allowed before the initial Lease Contract term ends, except for changes allowed by any special provisions in paragraph 10, by a written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed under paragraph 18. If, at least 5 days before the advance notice deadline referred to in paragraph 3, we give you written notice of rent increases or Lease Contract changes effective when the Lease Contract term or renewal period ends, this Lease Contract will automatically continue month-to-month with the increased rent or Lease Contract changes. The new modified Lease Contract will begin on the date stated in the notice (without necessity of your signature) unless you give us written move-out notice under paragraph 37 applies only to the end of the current Lease Contract or renewal period.

**16. DELAY OF OCCUPANCY.** If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, we're not responsible for that delay. The Lease Contract will remain in force subject to: (1) abatement of rent on a daily basis during delay; and (2) your right to terminate as set forth below. Termination notice must be in writing. After termination, you are entitled only to refund of deposit(s) and any rent paid. Rent abatement or Lease Contract termination does not apply if delay is for cleaning or repairs that don't prevent you from occupying the apartment.

If there is a delay and we haven't given notice of delay as set forth immediately below, you may terminate up to the date when the apartment is ready for occupancy, but not later.

(1) If we give written notice to any of you when or after the Lease Contract begins—and the notice states that construction has been delayed because of construction or a previous resident's holding over, and that the apartment will be ready on a specific date—you may terminate the Lease Contract within 3 days of your receiving the notice, but not later.

(2) If we give written notice to any of you before the effective Lease Contract date and the notice states that construction delay is expected and that the apartment will be ready for you to occupy on a specific date, you may terminate the Lease Contract within 7 days after you receive written notice, but not later. The move-in date is considered the new effective Lease Contract date for all purposes. This new date may not be moved to an earlier date unless we and you agree.

**17. DISCLOSURE RIGHTS.** If someone requests information on you or your rental history for law-enforcement, governmental, or business purposes, we may provide it. As one request, any utility provider may furnish us information about pending or actual connections or disconnections of utility service to your apartment.

business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, or other business associates do not come to your apartment for business purposes. We may regulate (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and delivery persons; and (3) activities in common areas.

We may exclude from the apartment community guests or others who, in our judgment, have been violating the law, violating this Lease Contract or any apartment rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area a person who refuses to show photo identification or refuses to identify himself or herself as a resident, occupant, or guest of a specific resident in the community.

You will notify us within 15 days if you or any occupants are convicted of any felony, or misdemeanor involving a controlled substance, violence to another person or destruction of property. You also agree to notify us within 15 days if you or any occupants register as a sex offender in any state. Informing us of criminal convictions or sex offender registry does not waive any rights we have against you.

**20. PROHIBITED CONDUCT.** You and your occupants or guests may not engage in the following activities: criminal conduct

**21. PARKING.** We may regulate the time, manner, and place of parking of cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles. Motorcycles or motorized bikes may not be parked inside an apartment or on sidewalks, under stairwells, or in handicapped parking areas. We may have unauthorized or illegally parked vehicles towed, or booted according to state law at the owner or operator's expense at any time if its:

(1) has a flat tire or is otherwise inoperable.
(2) is on jacks, blocks or has wheel(s) missing
(3) takes up more than one parking space
(4) belongs to a resident or occupant who has surrendered or abandoned the apartment
(5) is in a handicap space without the legally-required handicap insignia
(6) is in a space marked for office vehicles, managers, or staff
(7) blocks another vehicle from passing
(8) is in a fire lane or designated "no parking" area
(9) is in a space marked for other vehicle(s) or apartment(s)
(10) is on the grass, sidewalk, or patio
(11) blocks garbage trucks from access to a dumpster, or
(12) has no current license, registration or inspection sticker, and we give you at least 10-day notice that the towed it comply pursuant.

**22. RELEASE OF RESIDENT.** Unless you're entitled to terminate this Lease Contract under paragraphs 10, 16, 23, 31 or 37, you won't be released from this Lease Contract for any reason—including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment, bad health, death, or property purchase.

**Death of Sole Resident.** If you are the sole resident, upon your death you may reinstate the Lease Contract without penalty with at least 30 days' written notice. You will be liable for payment of rent until the latter of: (1) the termination date, or (2) until all procedures in the apartment are removed. You will be liable for all rent, charges, and damages to the apartment until it is vacated, and any removal and storage costs.

**23. MILITARY PERSONNEL CLAUSE.** You may terminate the Lease Contract if you enlist or are drafted or commissioned in the U.S. Armed Forces. You also may terminate the Lease Contract if:

(a) you are (1) a member of the U.S. Armed Forces or reserves on active duty; or (b) a member of the National Guard called to active duty for more than 30 days in response to a national emergency declared by the President; and

(b) you (1) receive orders for permanent change-of-station, (2) receive orders to deploy with a military unit or as an individual in support of a military operation for 90 days or more, or (3) are relieved or released from active duty.

After you tell us in writing you want to terminate, the Lease Contract will be terminated under the military clause 30 days after the date on which your next rental payment is due. You must furnish us a copy of your military orders, such as permanent change-of-station orders, call-up orders, or deployment orders or letter. Military permission for base housing doesn't constitute a permanent change-of-station order. After you move out, we'll return your security deposit, less lawful deductions. For the purposes of this Lease Contract, orders described in (2) above will only release the resident who qualifies under (1) and (2) above and receives the orders during the Lease Contract term and such resident's spouse or legal dependents living in the resident's household. A co-resident who is not your spouse or dependent cannot terminate under this military clause. Unless you are otherwise in default under this Lease Contract, you cannot invoke any other rights under paragraph 38, you represent when signing this Lease Contract that: (1) you do not already have deployment or change-of-station orders; (2) you will not be retiring from the military during the Lease Contract term; and (3) the term of your enlistment or commitment will end before the Lease Contract term ends. Liquidated damages for making a false representation of the above will be the amount of unpaid rent for the remainder of the lease term when and if you move out, less rents from other residents in mitigation under paragraph 32. You must immediately notify us if you are called to active duty or receive deployment or permanent change-of-station orders.

**24. RESIDENT SAFETY AND LOSS.** You and all occupants and guests must exercise due care for your own and others' safety and security, especially in the use of smoke and other detection devices, door and window locks, and other safety or security devices. You agree to make every effort to follow the Security Guidelines on page 5. Window screens are not for security or keeping people from falling out.

**Detection Devices.** We'll furnish smoke or other detection devices required by statute or city ordinance, and we'll test them and provide working batteries when you first take possession. After that, you must pay for and replace batteries as needed, unless the law provides otherwise. We may replace dead or missing batteries in your unit, without prior notice to you. You must test smoke/carbon detectors/detectors as often as possible. You'll be liable to us under this Lease Contract if you disable or damage a detector and keep making, for any reason(s), a smoke detector or detection device inoperative. Other remedies we have if you don't comply are in paragraph 11 and 32.

Neither we nor our management company are liable to you for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. We're not liable to you for such criminal conduct by reason of our failure to provide security or inadequate security. Because we are not liable to you for others' criminal acts, you should protect yourself and your family. If you, occupants, or guests are affected by crime, you should make a report to local law-enforcement and to us. You should also pursue criminal charges. We are not obligated to monitor the premises, employ a security company, or obtain criminal background checks on residents or occupants, and we won't be liable for failing to do any of those things. We are not responsible for obtaining criminal-history checks on any residents, occupants, guests, or contractors in the apartment community.

...

**35. CONDITION OF THE PREMISES AND ALTERATIONS.** We disclaim...

SGR\13977SGR\1397714.95.005

28. **WHEN WE MAY ENTER.** If you or any guest or occupant is present, then repairers, servicers, contractors, our representatives, or other persons listed in (2) below may peacefully enter the apartment at reasonable times for the purposes listed in (2) below. If nobody is in the apartment, then such persons may enter peacefully and at reasonable times by duplicate or master key if:

(1) written notice of the entry is left in a conspicuous place in the apartment immediately after the entry; and

(2) entry is for: responding to your request; making repairs or replacements; estimating repair or refurbishing costs; performing pest control; doing preventive maintenance; changing filters; testing or replacing detection devices; retrieving unreturned tools, appliances, or equipment; preventing waste of utilities; exercising our contractual lien; leaving notices; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or security devices; removing or rekeying unauthorized security devices; removing unauthorized window coverings; stopping excessive noise; removing health or safety hazards (including hazardous materials), or items prohibited under our rules; removing perishable foodstuffs if your electricity is disconnected; removing unauthorized animals; cutting off electricity according to statute; retrieving property owned or leased by former residents; inspecting when immediate danger to person or property is reasonably suspected; allowing persons to enter as you authorized in your rental application (if you die, are incarcerated, etc.); allowing entry by a law officer with a search or arrest warrant, or in hot pursuit; showing apartment to prospective residents (after move-out or vacate notice has been given) or showing apartment to government representatives for the limited purpose of determining housing and fire ordinance compliance, and to lenders, appraisers, contractors, prospective buyers, or insurance agents.

29. **MULTIPLE RESIDENTS.** Each resident is jointly and severally liable for all Lease Contract obligations. If you or any guest or occupant violates the Lease Contract or rules, all residents are considered to have violated the Lease Contract. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. Notices and requests from any resident or occupant constitute notice from all residents. Your suit of Lease Contract termination may be given only by residents. In eviction suits, each resident is considered the agent of all other residents in the apartment for service of process. Any resident who defaults under this Lease Contract will indemnify the non-defaulting residents and their guarantors.

Security deposit refund check and any deduction itemizations will be (check one):
☐ one check jointly payable to all residents and mailed to any one resident we choose, OR
☐ one check payable and mailed to _____
_____ jointly/severally/several/and.
If neither is checked, then the refund will be made in one check jointly payable to all residents.

30. **REPLACEMENTS AND SUBLETTING.** Replacing a resident, subletting, or assignment is allowed only when we consent in writing. If departing or remaining residents find a replacement resident acceptable to us before moving out and we expressly consent to the replacement, subletting, or assignment, then:

(1) a reletting charge will not be due;
(2) a reasonable administrative (paperwork) fee will be due; and a rekeying fee will be due if rekeying is requested or required; and
(3) the departing and remaining residents will remain liable for all Lease Contract obligations for the rest of the original Lease Contract term.

Procedures for Replacement. If we approve a replacement resident, then, at our option: (1) the replacement resident must sign this Lease Contract with or without an increase in the total security deposit; or (2) the remaining and replacement residents must sign an entirely new Lease Contract. Unless we agree otherwise in writing, your security deposit will automatically transfer to the replacement resident as of the date we approve. The departing resident will no longer have a right to occupancy or a security deposit refund, but will remain liable for the remainder of the original Lease Contract term unless we agree otherwise in writing—even if a new Lease Contract is signed.

31. **RESPONSIBILITIES OF OWNER.** We'll act with customary diligence to:
(1) keep common areas reasonably clean, subject to paragraph 26;
(2) maintain fixtures, hot water, heating, and A/C equipment;
(3) substantially comply with all applicable laws regarding safety, sanitation, and fair housing; and
(4) make all reasonable repairs, subject to your obligation to pay for damages for which you are liable.

If we violate any of the above, you may terminate this Lease Contract and exercise remedies under Texas Property Code Section 92.056 by following these procedures:

(a) all rent must be current and you must make a written request for repair or remedy of the condition—after which we'll have a reasonable time for repair or remedy;

(b) if we fail to do so, you must make a second written request for the repair or remedy (to make sure there has been no miscommunication between us)—after which we'll have a reasonable time for the repair or remedy; and

(c) if the repair or remedy still hasn't been accomplished within the reasonable time period, you may immediately terminate the Lease Contract by giving us a final written notice. You also may exercise other statutory remedies, including those under Texas Property Code Section 92.056.

Instead of giving the two notices referred to above, you may give us one request for repair or remedy of the condition, if your request is made by certified mail, return receipt requested, or by telegram. "Reasonable Time" takes into account the nature of the problem and the reasonable availability of materials, labor, and utilities. Your rent must be current at the time of any request. We may require all requests to be in writing.

32. **DEFAULT BY RESIDENT.** You'll be in default if: (1) you don't pay rent or other amounts that you owe on time; (2) you or any guest or occupant violates this Lease Contract, apartment rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (3) you abandon the apartment; (4) you give incorrect or false answers in a rental application; (5) you or any occupant is arrested, charged, detained, convicted, or given deferred adjudication or pretrial diversion for (i) a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia as defined in the State Controlled Substances Act, or (ii) any sex-related crime, including a misdemeanor; (6) any illegal drug or paraphernalia is found in your apartment; or (7) you or any occupant, in bad faith, makes an invalid complaint to an official or employee of a utility company or the government.

Eviction. If you default, we may end your right of occupancy by giving you a 24-hour written notice to vacate. Notice may be by: (1) regular mail; (2) certified mail, return receipt requested; (3) personal delivery to any resident; (4) personal delivery at the apartment to any occupant over 16 years old; or (5) affixing the notice to the inside of the apartment's main entry door. Notice by mail will be considered delivered on the earlier of (1) actual delivery, or (2) three days after mailing. Termination of your possession rights or subsequent reletting doesn't release you from liability for future rent or other Lease Contract obligations. After giving notice to vacate or filing an eviction suit, we may still accept rent or other sums due; the filing or acceptance doesn't waive or diminish our right of eviction, or any other contractual or statutory right. Accepting money at any time doesn't waive our right to damages; to past or future rent or other sums; or to continue with eviction proceedings.

Acceleration. All monthly rent for the rest of the Lease Contract term or renewal period will be accelerated automatically without notice or demand (before or after acceleration) and will be immediately due and delinquent if, without your written consent to an assignment: (1) you move out, remove property in preparing to move out, or give oral or written notice (by you or any occupant) of intent to move out before the Lease Contract term or renewal period ends; and (2) you've not paid all rent for the entire Lease Contract term or renewal period. Such conduct is considered a default for which we need not give you notice. Remaining rent also will be accelerated if you're judicially evicted or move out when we demand because you've defaulted. Acceleration is subject to our obligation-mitigation duties below.

Holdover. You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then (1) holdover rent is due in advance on a daily basis and may become delinquent without notice or demand; (2) rent for the holdover period will be increased by 20% over the then-existing rent, without notice; (3) you'll be liable to us (subject to our mitigation duties) for all rent for the full term of the previously signed Lease Contract of a new resident who can't occupy because of the holdover; and (4) at our option, we may impose a new Lease Contract term for up to one month from the date of notice of Lease Contract extension by delivering written notice to you or your apartment while you continue to hold over.

Other Remedies. We may report unpaid amounts to credit agencies. If you default on rent or other amounts due, you'll pay us any amounts stated to be rental discounts or concessions agreed to in writing, in addition to other sums due. Upon your default, we have all other legal remedies, including Lease Contract termination and statutory lockout under Section 92.001, Texas Property Code, except as prohibited below (when we are seeking statutory lockout) and Section 24.0061, Texas Property Code. A prevailing party may recover reasonable attorney's fees and all other litigation costs from the non-prevailing party, including court costs and reasonable attorney's fees in connection with a party's claims seeking enforcement of this Lease Contract. We may recover attorney's fees in connection with enforcing our rights under this Lease Contract. You agree that late charges are liquidated damages and a reasonable estimate of such damages for any time, inconvenience, and overhead associated with collecting late rent (but are not for attorney's fees or litigation costs). All unpaid amounts bear 18% interest per year from due date, compounded annually. You must pay all collection-agency fees if you fail to pay all sums due within 10 days after we mail you a letter demanding payment and stating that the collection agency fees will be added if you don't pay all sums by that deadline.

Mitigation of Damages. If you move out early, you'll be subject to paragraph 11 and all other remedies. We'll exercise customary diligence to relet and minimize damages. We'll credit all subsequent rent that we actually receive from subsequent residents against your liability for past-due and future rent and other sums due.

APARTMENT LEASE CONTRACT      © 2008, TEXAS APARTMENT ASSOCIATION, INC.

SGR\13977SGR\1397714.95.005

## General Clauses

**33. MISCELLANEOUS.** Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease Contract is the entire agreement between you and us. Our representative (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease Contract or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives unless in writing. No action or omission by us will be considered a waiver of our rights or of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, acceleration, liens, or other rights isn't a waiver under any circumstances. Except when notice or demand is required by statute, you waive any notice and demand for performance from us if you default. Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease Contract should receive a copy of the memo, letter, or fax that was given, as well as any fax transmittal verification. Fax or electronic signatures are binding. All notices must be signed. Notices may just be given by email or other electronic instrument.

Exercising one remedy won't constitute an election or waiver of other remedies. Insurance subrogation is waived by all parties. All remedies are cumulative. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf. This Lease Contract binds subsequent owners. Neither an invalid clause nor the omission of initials on any page invalidates this Lease Contract. All notices and documents may be in English and, at our option, in any language that you read or speak. All provisions regarding our non-liability and non-duty apply to our employees, agents, and management companies. This Lease Contract is subordinate to existing and future recorded mortgages, unless the owner's lender chooses otherwise. All Lease Contract obligations must be performed in the county where the apartment is located.

We may deactivate or not install keyless locking devices on your doors if (1) you or an occupant in the dwelling is over 55 or disabled, and (2) the requirements of Section 92.153(e) or (f), Texas Property Code are satisfied.

## Security Guidelines for Residents

**36. SECURITY GUIDELINES.** We care about your safety and that of other occupants and guests. No security system is failsafe. Even the best system can't prevent crime. Always act as if security systems don't exist since they are subject to malfunction, tampering, and human error. We disclaim any express or implied warranties of security. The best safety measures are the ones you perform as a matter of common sense and habit.

Inform all other occupants in your apartment, including any children you may have, about these guidelines. We recommend that all residents and occupants use common sense and follow crime-prevention tips, such as those listed below:

- In case of emergency, call 911. Report emergencies to authorities first and then contact the management.
- Report any suspicious activity to the police first, and then follow up with a written notice to us.
- Know your neighbors. Watching out for each other is one of the best defenses against crime.
- Always be aware of your surroundings and avoid areas that are not well-traveled or well-lit.
- Keep your keys handy at all times when walking to your car or home.
- Do not go inside if you arrive home and find your door open. Call the police from another location and ask them to meet you before entering.
- Make sure door locks, window latches and sliding glass doors are properly secured at all times.
- Use the keyless deadbolt in your apartment when you are at home.
- Don't put your name or address on your key ring or hide a key to your apartment in obscure places. No under a flower pot. If you lose a key or have it compromised, buy safety, we will change your keys at your expense, in accordance with paragraph 9 of the Lease Contract.

- Check the door viewer before answering the door. Don't open the door if you don't know the person, or have any doubts. Children who are old enough to take care of themselves should never let anyone inside when home without an adult.
- Regularly check your security devices and smoke and other detectors to make sure they are working properly. Detection devices/batteries should be tested monthly and replaced at least twice a year.
- Immediately report in writing (dated and signed) to us any needed repairs of security devices, doors, windows, smoke and other detectors, as well as any other malfunctioning safety devices on the property, such as broken access gates, burned-out exterior lights, etc.
- If your doors or windows are not secure due to a malfunction or break-in, stay with a friend or neighbor until the problem is fixed.
- When you leave home, make arrangements so someone knows where you're going and when you plan to be back.
- Lock your doors and leave a radio or TV playing softly while you're gone. Close curtains, blinds and window shades at night.
- While gone for an extended period, secure your home and use timer timers. Also stop all deliveries (such as newspaper and mail) or have them picked up daily by a friend.
- Know at least two exit routes from your home, if possible.
- Don't give away keys, codes or gate access cards to anyone.
- Always lock the doors on your car, even while driving. Take the keys and remove or hide any valuables. Park your vehicle in a well-lit area.
- Check the locks once before getting into your car. Be careful stopping at gas stations or automatic-teller machines at night—or anytime when you suspect danger.

These are many other crime prevention tips readily available from police departments and others.

## When Moving Out

**37. MOVE-OUT NOTICE.** Before moving out, you must give our representative advance written move-out notice as provided below. Your move-out notice will not release you from liability for the full term of the Lease Contract or renewal term. You will still be liable for the entire Lease Contract term if you move out early (paragraph 22) except under paragraphs 10, 16, 22, 23 or 31. YOUR MOVE-OUT NOTICE MUST COMPLY WITH EACH OF THE FOLLOWING:

- We must receive advance written notice of your move-out date. The advance notice must be at least the number of days of notice required in paragraph 3 or its special provisions—even if the Lease Contract has become a month-to-month lease. If a move-out notice is received on the first, it will suffice for move-out on the last day of the month of intended move-out, provided that all other requirements below are met.
- The move-out date in your notice (which must 0) must be the last day of the tenancy, or if may be the exact day designated in your notice (if neither is checked, the second applies.

- Your move-out notice must be in writing. Oral move-out notice will not be accepted and will not terminate your Lease Contract.
- Your move-out notice must not terminate the Lease Contract sooner than the end of the Lease Contract term or renewal period.
- If we require you to give us more than 30 days written notice to move-out before the end of the lease term, we will give you a written reminder not less than 5 days nor more than 30 days before your deadline for giving us your written move-out. If we fail to provide a reminder notice, 30 days written notice to move-out is required.

YOUR NOTICE IS NOT ACCEPTABLE IF IT DOES NOT COMPLY WITH ALL OF THE ABOVE. We recommend you use our written move-out form to ensure you provide the information needed. You must obtain from us written acknowledgment that we received your move-out notice. If we terminate the Lease Contract, we must give you the same advance notice—unless you are in default.

05/03/2010  11:18    9797647768    COLONY    PAGE  10/16

**38. MOVE-OUT PROCEDURES.** ...

**39. CLEANING.** You must thoroughly clean the apartment, including ...

**40. MOVE-OUT INSPECTION.** You should meet with our representative for a move-out inspection. ...

**41. SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES.** You'll be liable for the following charges, if applicable: ...

**42. DEPOSIT RETURN, SURRENDER, AND ABANDONMENT.** We'll mail you your security deposit refund (less lawful deductions) and an itemized accounting of any deductions no later than 30 days after surrender or abandonment, unless statutes provide otherwise.

**43. ORIGINALS AND ATTACHMENTS.** ...

☐ Access Gate Addendum
☐ Additional Special Provisions
☐ Aerial Addendum
☐ Apartment Rules or Community Policies
☒ Asbestos Addendum (if asbestos is present)
☐ Early Termination Addendum
☐ Enclosed Garage, Carport or Storage Unit Addendum
☒ Inventory & Condition Form
☐ Intrusion Alarm Addendum
☐ Lead Hazard Information and Disclosure Addendum
☐ Lease Contract Guaranty (____ guaranties, if more than one)
☐ Legal Description of Apartment (if rental term longer than one year)
☐ Military SCRA Addendum
☒ Mold Information and Prevention Addendum
☐ Move-Out Cleaning Instructions
☐ Notice of Intent to Move Out Form
☐ Parking Permit or Sticker (quantity:____)
☐ Rent Concession Addendum
☐ Renter's or Liability Insurance Addendum
☐ Repair or Service Request Form
☐ Satellite Dish or Antenna Addendum
☐ TCEQ Tenant Guide to Water Allocation
☐ Utility Allocation Addendum for: ☐ electricity ☐ water ☐ gas ☐ central system costs ☐ trash removal ☐ cable TV
☐ Utility Submetering Addendum for: ☐ electricity ☐ water ☐ gas
☐ Other _____
☐ Other _____

Before submitting a rental application or signing a Lease Contract, you may take a copy of these documents to review and/or consult an attorney.

Additional provisions or changes may be made in the Lease Contract if agreed to in writing by all parties.

You are entitled to receive an original of this Lease Contract after it is fully signed. Keep it in a safe place.

_signature_    1/3/10    Date signed

_____    Date signed

_____    Date signed

Owner or Owner's Representative (signing on behalf of owner)

BMU AMB

Address and phone number of owner's representative for notice purposes

410 South Texas Avenue
College Station, TX 77840
979-846-4242

After-hours phone number  979-846-4242
(Always call 911 for police, fire or medical emergencies)

Date form is filled out (same as on top of page 1)  12-28-09

AT-APARTMENT LEASE CONTRACT    TAA Official Statewide Form 09-A/Y-1/Y-2 Revised October, 2009, Copyright 2009, Texas Apartment Association

38

SGR\13977SGR\1397714.95.005

**Exhibit "E"**

Current Site Plan (Attached)



40

**SCHEDULE 4(e)**

| | | | |
|---|---|---|---|
| 85th Dist. Ct., Brazos County, TX 110-001870-CV-85 | Pltf: Pacific Mercantile Bank Debtor Defs: Rossco Holdings, Inc.; Colony Lodging, Inc. Non-debtor Co-Defendants: Lodgeco Properties, Ltd. | Suit to compel arbitration and appointment of receiver | Suggestion of Bankruptcy Filed (7/27/2010) |
| American Arbitration Association, Orange County, CA 773-148-Y-00255-10-GLO | Pltf: Pacific Mercantile Bank Debtor Deffs: Rossco Holdings, Inc.; Monte Nido Estates, LLC; WM Properties, Ltd.; Colony Lodging, Inc. Non-debtor Co-Defendants: Lodgeco, Inc.; Leonard M. Ross Revocable Trust; Leonard M. Ross; Monte Nido Homes, LLC; Rossco MP Properties Co., LLC | Commercial Arbitration Demand | Notice of Bankruptcy given to Manager of ADR Services, by letter dated August 11, 2010, from Steven D. Atlee, and by letter dated August 12, 2010, from Leonard M. Ross |