THE CREDITORS' LAW GROUP, APC
David J. Richardson (State Bar No. 168592)
djr@thecreditorslawgroup.com
Laura L. Buchanan (State Bar No. 156261)
llb@thecreditorslawgroup.com
2301 Hyperion Avenue, Ste. A
Los Angeles, CA 90027
Telephone:    (323) 686-5400
Facsimile:    (323) 686-5403

Attorneys for Rossco Holdings, Inc.,
Debtor and debtor-in-possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re: | ) **Case No. 2:10-bk-55951-VZ** |
| | ) |
| ROSSCO HOLDINGS, INC., | ) |
| | ) Chapter 11 |
| Debtor. | ) |
| | ) |
| | ) **NOTICE OF MOTION FOR APPROVAL OF** |
| | ) **BIDDING PROCEDURES AND FORM OF** |
| | ) **NOTICE IN CONNECTION WITH SALE OF** |
| | ) **REAL PROPERTIES FREE AND CLEAR OF** |
| | ) **LIENS, CLAIMS, ENCUMBRANCES, AND** |
| | ) **INTERESTS PURSUANT TO 11 U.S.C. § 363** |
| | ) |
| | ) **Hearing** |
| | ) Date:    April 21, 2011 |
| | ) Time:    11:00 a.m. |
| | ) Judge:   Hon. Vincent P. Zurzolo |
| | )            Courtroom 1368 |
| | )            255 East Temple Street |
| | )            Los Angeles, CA 90012 |
| | ) |
| | ) |
| | ) |
| | ) |

TO THE HONORABLE VINCENT ZURZOLO, UNITED STATES BANKRUPTCY JUDGE,

ALL CREDITORS IN THIS CASE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND

ALL OTHER PARTIES REQUESTING SPECIAL NOTICE:

**PLEASE TAKE NOTICE** that Rossco Holdings, Inc., the debtor and debtor-in-possession

in the above-referenced case (the "Debtor" or "Rossco"), has filed the Motion for Approval of

The Creditors' Law Group, a Professional Corporation
2301 Hyperion Avenue, Ste. A, Los Angeles, CA 90027
Tel. (323) 686-5400    Fax (323) 686-5403

1  Bidding Procedures and Form of Notice in Connection with Sale of Real Properties Free and Clear

2  of Liens, Claims, Encumbrances, and Interests pursuant to 11 U.S.C. § 363 ("Sale Procedures

3  Motion"), which seeks an order under sections 105(a), 363, and 365 of the Bankruptcy Code, and

4  Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

5  approving proposed bidding procedures to govern the sale of certain real property owned by Rossco

6  located in College Station, Texas, which is to be sold along with contiguous parcels owned by

7  related non-debtor entities and a small parcel owned by chapter 11 debtor-in-possession Leonard M.

8  Ross ("Ross"). Each of the respective sellers of the related parcels has entered into a contract of sale

9  with the buyer that requires a closing by May 9, 2011.

10  **PLEASE TAKE FURTHER NOTICE** that the Contribution and Sale Contract between

11  Rossco and the buyer is attached hereto as Exhibit A.

12  **PLEASE TAKE FURTHER NOTICE** that the property that is the subject of the Sale

13  Procedures Motion is comprised of multiple parcels owned by Rossco, and multiple parcels owned

14  by related entities, that are located in College Station, Texas, in a central location at the entrance to

15  Texas A&M University. A complete legal description of the parcels owned by Rossco is attached to

16  the Contribution and Sale Contract that is attached hereto Exhibit A (collectively, the "Rossco

17  Property").

18  **PLEASE TAKE FURTHER NOTICE** that the Sale Procedures Motion seeks approval of

19  the following Bid Procedures:

20  a.  A sale hearing shall be held on May 5, 2011, at 11:00 a.m., in the United States

21  Bankruptcy Court for the Central District of California, Los Angeles Division,

22  Courtroom 1368, upon twenty-one (21) days regular notice to creditors, so that the Sale

23  may close by May 9, 2011.

24  b.  Rossco may continue to solicit and receive bids to purchase all or a portion of the Rossco

25  Property through to and until May 2, 2011, at 5:00 p.m. Pacific time (the "Bid

26  Deadline");

27  c.  In order for a bid to be considered, it must:

28  -  be in writing;

The Creditors' Law Group, a Professional Corporation
2301 Hyperion Avenue, Ste. A, Los Angeles, CA 90027
Tel. (323) 686-5400    Fax (323) 686-5403

5

- include cash and non-cash consideration, such that the Debtor may determine in its sole discretion whether the total consideration offered by the competing bid exceeds the combined Cash Consideration and non-cash consideration provided by the APA and Development Agreement;

- specify which parcels, if not all, of the College Station Properties, are included in the bid, and the consideration allocated to each;

- not contain any financing or due diligence contingencies beyond those contained in the APA;

- be accompanied by a marked copy of the APA, which shall be the agreement pursuant to which such prospective purchaser proposes to acquire the Rossco Property[1];

- be accompanied by evidence of committed financing or other ability to perform;

- be accompanied by a good-faith deposit of $100,000, payable to Rossco;

- be accompanied by a letter stating that the bidder's offer is irrevocable until the earlier of: (i) two business days after the closing date of an alternative sale or sales approved by the Bankruptcy Court; and (ii) forty-five days after the conclusion of the Sale Hearing.

- A bid that satisfies these requirements, in the Debtor's sole discretion, shall be a "Qualifying Bid," and the party proposing the bid shall be a "Qualified Bidder." Thus, any potential bidder may submit an all-cash bid, or a bid that is a combination of cash and non-cash consideration, such as the APA, but it would remain within the Debtor's sole discretion to determine whether the consideration offered in any potential bid makes it a bid that exceeds the consideration provided by the APA and Development Agreement, and qualifies as a Qualifying Bid.

---

[1] This does not mean that all bidders are constrained by the nature of the Woodridge proposal, nor that bidders must propose similar development terms. Rather, it requires that proposed purchase agreements track the basic terms of the APA so that the Debtor will be more able to compare competing bids side-by-side. Given the potentially differing make up of consideration to be offered by competing bidders, it is critical that the proposed agreements be as amenable to comparison as possible.

The Creditors' Law Group, a Professional Corporation
2301 Hyperion Avenue, Ste. A, Los Angeles, CA 90027
Tel. (323) 686-5400    Fax (323) 686-5403

The Creditors' Law Group, a Professional Corporation
2301 Hyperion Avenue, Ste. A, Los Angeles, CA 90027
Tel. (323) 686-5400    Fax (323) 686-5403

d.   If any Qualifying Bid(s) is/are received prior to the Bid Deadline, the Debtor will electronically file in the Rossco Case by 8:00 p.m. Pacific Time on May 2, 2011 (and serve upon Qualified Bidders as soon as possible thereafter by email and/or facsimile, a notice of which bid the Debtor considers the highest and best bid, which will therefore serve as the lead bid at the Auction (the "Lead Bid"), and such notice shall provide the Debtor's valuation of any non-cash consideration provided by the Lead Bid;

e.   If any Qualifying Bid(s) is/are received prior to the Bid Deadline, an auction (the "Auction") will be held on May 3, 2011, at 2:00 p.m., Pacific time, at a location to be confirmed with qualifying bidders.

f.   Woodridge shall be deemed a Qualifed Bidder and the terms of the APA and Development Agreement shall be deemed a Qualified Bid.

g.   At the Auction, the Debtor shall announce at the start of the Auction which Qualifying Bid it has deemed to be the Lead Bid.  Other Qualifying Bidders will then have an opportunity to amend their Qualifying Bid, and the Debtor will determine, in its sole discretion, if any amended Qualifying Bid (an "Overbid") exceeds the Lead Bid, based upon its comparison of cash and non-cash consideration.  If so, then the successful Overbid will form the new Lead Bid for a subsequent round of bidding, and so on until the Debtor has determined, in its sole discretion, that it has received a final bid that provides the Debtor's estate with the highest and best value for the Rossco Property. Each round of bidding shall be carried out with a reasonable, but not excessive, amount of time for each of the Qualified Bidders to determine and submit their overbids.

h.   At the conclusion of the Auction, Rossco will select the highest and best offer which it will designate the successful bidder and will designate the second highest and best offer as the backup bidder (the "Designation of Bids").  Rossco will continue to designate backup bidders until the Buyer is the last backup bidder (unless the Buyer is the successful bidder).  Rossco shall file its Designation of Bids of the successful bidder and designated backup bidders no later than May 4, 2011 by 5:00 p.m.

1    i.    Any party-in-interest may object to the Designation at the Sale Hearing, or to any denial

2          of its request to be deemed a Qualified Bidder.

3    j.    In the event the closing with the successful bidder does not occur within the time ordered

4          by the Court at the Sale Hearing, Rossco may proceed to close with the back-up bidder

5          and any subsequent back-up bidder thereafter (collectively, the "Bid Procedures").

6         **PLEASE TAKE FURTHER NOTICE** that Rossco has been marketing the Rossco

7    Property, along with the entire College Station Properties, for approximately one year.

8         Prior to, and following, the Petition Date, Rossco, Lodgeco and CHSC had carried out

9    negotiations for the sale of a portion of the College Station Properties to PMH Acquisition, LLC

10   ("PMH"). Rossco filed a motion for authority to sell certain of the real property owned by Rossco to

11   PMH, as part of a larger sale of real property to PMH, on or about November 9, 2010 (the "Proposed

12   PMH Sale"). However, in January 2011, PMH terminated the proposed sale because of unresolved

13   issues with the City of College Station, Texas pertaining to the city's assertion of certain proposed

14   rights of way. The process of negotiating a sale agreement with PMH, filing the PMH Sale Motion,

15   setting up an auction date, and ultimately announcing the termination of the sale to PMH, further

16   publicized the Debtor's interest in selling the Rossco Property, and since the PMH sale was

17   terminated, the Sellers have engaged in discussions with several interested parties.

18        **PLEASE TAKE FURTHER NOTICE** that any opposition to the Sale Procedures Motion

19   is due on or before 1 day prior to the hearing (i.e. April 20, 2011), unless otherwise ordered by the

20   court, pursuant to Local Bankruptcy Rule 6004-1(b). Papers filed in opposition to the motion must

21   be served by personal delivery, messenger, fax, or e-mail. A judge's copy of the opposition must be

22   served on the judge in chambers in accordance with Local Bankruptcy Rule 5005-2(d).

23

24   DATED: April 14, 2011                    ___/s/ David J. Richardson_____

25                                            DAVID J. RICHARDSON
                                             LAURA L. BUCHANAN
26                                           THE CREDITORS' LAW GROUP, APC
                                             Attorneys for Rossco Holdings, Inc., Debtor and
27                                           Debtor-In-Possession

28

The Creditors' Law Group, a Professional Corporation
2301 Hyperion Avenue, Ste. A, Los Angeles, CA 90027
Tel. (323) 686-5400    Fax (323) 686-5403

# EXHIBIT A

## CONTRIBUTION AND SALE CONTRACT

THIS CONTRIBUTION AND SALE CONTRACT ("Contract") is made and entered into by and between Rossco Holdings Incorporated, a California corporation ("Seller") and Woodridge Capital Finance Fund I, LLC, a Delaware limited liability company, or its assignee ("Purchaser") as of this 13th day of April, 2011 (the "Effective Date").

## RECITALS

A.    Seller is the owner of certain real property located in the County of Brazos, Texas, as more particularly described on Exhibit A attached hereto (the "Land").

B.    Purchaser is in the business of acquiring, developing, constructing and operating real property and related assets.

C.    Seller and Purchaser are entering into this Contract, pursuant to which Seller is contributing to the Purchaser the Property (as defined below), in exchange for which Seller will receive the Contribution Consideration (as defined in Section 2 hereof), shall become a limited liability company member of Sponsor Member (defined below) and execute a counterpart member signature page and agree to be bound by the terms of Sponsor Member's limited liability company agreement (the "Operating Agreement").

D.    Simultaneously herewith, Lodgeco Properties, Ltd., a Texas limited partnership, CHSC, Ltd., a Texas limited partnership, BCSK Management, Inc., a Texas corporation, and The Leonard M. Ross Revocable Trust U/D/T dtd 12-20-85, affiliates of the Seller (collectively, "Seller's Affiliates"), are entering into substantially similar Contribution and Sale Contracts, pursuant to which Seller's Affiliates are contributing and selling to Purchaser contiguous parcels of real property (which together with the Real Property, are referred to herein as the "College Station Project") in exchange for cash consideration and/or a Membership Interest in Purchaser (the "Related Purchase Contracts").

E.    It is contemplated that the Purchaser (through a to be formed subsidiary entity referred to herein as the "Sponsor Member"), will, no later than May 2, 2011, assign this Contract and the Related Purchase Contracts in exchange for a limited liability company membership interest in a joint venture to be formed with an institutional investor (the "Joint Venture"), which will develop, construct, finance, operate and sell the College Station Project.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises, and the mutual representations, warranties, covenants and agreements hereinafter set forth, the parties hereto agree as follows.

**Section 1.**    Agreement to Contribute, Sell, Accept and Purchase.    Upon the terms and subject to the conditions of this Contract and in reliance upon the representations, warranties and

-1-

agreements herein set forth, Seller is contributing, assigning, transferring and delivering to Purchaser, on the Closing Date, and Purchaser is accepting from Seller, free and clear of all liens, other than Permitted Exceptions (as defined herein), the Property (as hereinafter defined) whether tangible or intangible, real, personal or mixed, that are owned by Seller, including:

        a.      The Land, together with all rights and appurtenances thereto, including any right, title and interest, if any, of Seller in and to all oil, gas and other minerals in, on, under or that may be produced from said land, all strips and gores between the land and abutting properties, all rights in and to easements, air rights, development rights, zoning approvals, plans, studies, water rights, sewer rights and drainage rights incidental to such land including, without limitation, all of the water, sanitary sewer discharge treatment and other utility capacity allocated to the land or owned and held by Seller for the use and benefit thereof and all zoning and development approvals or rights in respect thereto (such land and interests being collectively referred to as the "Real Property").

        b.      All buildings, structures, fixtures and other improvements located on the Land (collectively referred to as the "Improvements").

        c.      All personal property, if any, located on or used in connection with the Real Property (the "Personal Property") excluding any claims and/or third party actions of Seller that accrued on or before the date hereof, which are unrelated to the Real Property or Improvements.

        d.      All other transferable rights, privileges, appurtenances, permits and licenses owned by Seller and in any way related to the properties described above in this Section 1, together with all contracts concerning the Real Property approved by the Purchaser during the Due Diligence Period (as defined herein).

The items described in (a), (b), (c), and (d) above are hereinafter collectively referred to as the "Property".

EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE PURCHASER IS NOT ASSUMING ANY LIABILITIES, DEBTS, OBLIGATIONS OR DUTIES OF SELLER OF ANY KIND OR NATURE WHATSOEVER.

**Section 2.** Contribution Consideration. The Contribution Consideration shall be the total of the following:

        a.      In consideration for and of the contribution and assignment to Purchaser of the Property hereunder at Closing, Purchaser will cause the Sponsor Member to issue Seller a Membership Interest in the Sponsor Member, having a Percentage Interest of Eleven and 33/100ths Percent (11.33%), and pay the Seller the amount of FOUR MILLION ONE HUNDRED SIXTY THOUSAND EIGHT HUNDRED FIFTY-SEVEN AND 06/100 DOLLARS ($4,160,857.06) (the "Cash Consideration"), which together with the cash consideration and percentage interest paid and issued to Seller's Affiliates in the Related Purchase Contracts will in the aggregate equal $19,500,000 of cash consideration and a Fifty

Percent (50%) Percentage interest in the Sponsor Member (the Cash Consideration and the Percentage Interest are collectively referred to herein as the "Purchase Price").

b.       The Sponsor Member will be a member of the Joint Venture and have a capital account in the Joint Venture of Five Million Five Hundred Thousand Dollars ($5,500,000.00).

**Section 3**. Earnest Money. Within three (3) business days following the Effective Date, Purchaser shall deliver to Fidelity National Title Agency, Inc., 260 Three Lincoln Centre, 5430LBJ Freeway, Dallas, Texas 75240, Attention: Ms. Karen E. Moreau, Telephone No. (972) 770-2121 (the "Title Company") the sum of Twenty-Two Thousand Six Hundred Sixty Dollars ($22,660) as refundable earnest money ("Earnest Money"), to be held by Title Company in escrow and to be delivered by Title Company in accordance with the provisions hereof. The Earnest Money shall be applied against the Cash Consideration at the Closing.

**Section 4**. Title Report and Survey.

a.       To the extent not previously delivered, five (5) days from the Effective Date hereof, Seller shall order from Title Company an updated Owner's Title Policy Commitment (the "Commitment") obligating the Title Company to issue to Purchaser at Closing an Owner's Policy of Title Insurance in the full amount of the Purchase Price, showing good and indefeasible fee simple title to the Real Property in Seller and showing all encumbrances and other matters, if any, relating to the Real Property, together with a true, correct and legible copy of each document referred to in the Commitment. With regard to the standard printed exceptions and other common exceptions generally included in Texas form Commitments for Title Insurance: (i) the exception for restrictive covenants shall be deleted or, if there are exceptions, shall be annotated to read "None of Record except (restrictions listed)"; (ii) the exception for area and boundaries shall be annotated to show that upon receipt by the Title Company of the Survey (as defined below), the exception will at the Closing be limited to "shortages in area" (but at Purchaser's election and cost); (iii) the exception for ad valorem taxes shall reflect only taxes for the year in which Closing occurs; (iv) there shall be no exception for "visible and apparent easements," for "public or private roads" or the like (although exception may be made to a specified unrecorded exception shown on the Survey); and (v) there shall be no exception for "rights of parties in possession", "tenants under unrecorded leases", or "lack of access". The Commitment shall be delivered to Purchaser no later than ten (10) business days from the Effective Date hereof. The cost of the Commitment and Title Policy, except for the deletion of the survey exception, shall be borne by Seller. Also within said ten (10) business day period Seller shall furnish to Purchaser a written report of searches made of the Uniform Commercial Code ("UCC") records setting out all financing statements filed with the Office of the Secretary of State of Texas and the County Clerk of Brazos County against Seller up to the Effective Date, together with true and complete copies of said financing statements.

b.       Seller has delivered a current on the ground, staked survey dated February 4, 2011, prepared by Brad Kerr, Registered Professional Land Surveyor No. 4502 of Kerr Surveying, LLC (the "Survey"). Seller and Purchaser agree that the Survey: (i) reflects the actual dimensions of the entirety of the Land, the number of square feet contained in the Land (such total area to be stated to the nearest 1/1000th of an acre), the location and dimensions of any highways, streets, roads, easements, right-of-way, setback lines, encroachments, or overlaps

located on or adjacent to the Land, (ii) identifies any easements, setback lines or other matters referred to in the Commitment by recording reference, (iii) includes the surveyor's registered number and seal, the date of the survey and a certificate satisfactory to Purchaser, (iv) reflects that the Land has access to and from a publicly dedicated street, road, or highway, and include the names of adjacent streets and roads, (v) reflects that the Land is not located within any flood plain, and (vi) is certified as a Category 1A, Condition II survey (as prescribed by the Texas Land Surveyors Association) and otherwise is sufficient to cause the Title Company to delete, except for "shortages in area", the printed exception for "discrepancies, conflicts or shortages in area or boundary lines, or encroachments, or any overlapping of improvements" in the Owner's Policy of Title Insurance to be delivered pursuant to Section 8(b)(l)(a) hereof. Any certificate of the updated Survey shall be specifically addressed to Seller, Purchaser and Title Company verifying the above information.

       c.    If the updated Commitment fails to show good and indefeasible fee simple title to the Real Property and Improvements in the Seller, or if the updated Commitment reflects any matter which is unacceptable to Purchaser, then Purchaser shall give Seller written notice thereof within ten (10) days of the later of the Effective Date or the receipt thereof, specifying the objections of Purchaser. After receipt of such notice, Seller shall use Seller's good faith efforts to cure such objections ("Seller's Title Cure Period"), and shall have until twenty (20) days thereafter in which to cure such objections. Seller shall not be required to institute any litigation to cure any such defect, except that, in all cases Seller, at its sole cost and expense, shall be obligated to cure, remove or insure around by Closing, all mortgages, deeds of trust, judgment liens, mechanic's and materialmen's liens, and other monetary liens and monetary encumbrances against the Real Property (other than the liens for taxes and assessments which are not delinquent or liens or encumbrances caused by the acts or omissions of Purchaser) whether or not Purchaser objects thereto, and any voluntary conveyances of interests in the Real Property by Seller after the Effective Date (collectively, the "Mandatory Cure Matters"). Under no circumstances shall Seller be required to spend more than $5,000.00 to cure any objections. If cure will cost more than $5,000.00, Seller, at its option, may terminate the Contract upon written notice to Purchaser and Title Company, and Purchaser shall receive a return of the Earnest Money, whereupon neither Seller nor Purchaser shall have any further rights or obligations under this Contract. On or before Closing, Seller will be obligated to pay in full all indebtedness pertaining to the Property and obtain fully executed releases of all liens securing said indebtedness. Seller may, upon written notice to Purchaser, cure monetary defects out of the Closing proceeds so long as said defects are cured or satisfied at Closing. All matters not objected to within the Due Diligence Period (excluding the Mandatory Cure Matters) period shall be "Permitted Exceptions". In no event shall the Mandatory Cure Matters be Permitted Exceptions and, notwithstanding any contrary provisions hereof, Seller is obligated to cure the same.

       d.    If Seller does not cure the objections referred to in Section 4(c) hereof such that the Commitment and Survey can be amended to give effect to matters that are cured, and give Purchaser written notice thereof within Seller's Title Cure Period, Purchaser shall, within five (5) days following the end of Seller's Title Cure Period, either (i) immediately terminate this Contract by giving written notice thereof to Seller and Title Company and thereupon receive a return of the Earnest Money, whereupon neither Seller nor Purchaser shall have any further rights or obligations under this Contract; or (ii) waive (by written instrument

sent or delivered to Seller) one or more of such objections and contingencies and consummate the purchase of the Property subject to said objections. If Purchaser fails to deliver its written waiver in accordance with the previous sentence, it shall be deemed to have terminated this Contract.

**Section 5.** Investigation by Purchaser.

a.     To the extent it has not yet done so,  Seller shall deliver to Purchaser copies of the following items which are in the possession or control of Seller or any of its affiliates  (collectively, the "Submission Matters"):

1.     Copies of all real property tax bills with respect to the Property for calendar year 2010, and a statement by Seller as to whether or not any taxing authority has given notice to Seller of intent to effect a change in the assessed value or basis for levy of taxes with respect to the Property indicated in such bills.

2.     A full set of plans, specifications and architectural floor plans for the Improvements and the name and address of the project architect.

3.     Copies of all engineering studies and reports in respect to the Improvements, and all soils and geotechnical reports in respect of the Real Property and all environmental audits and studies in respect to the Real Property and Improvements.

4.     Copies of all existing leases or other rights to occupancy of the Real Property; all notices of any violations; and all licenses, permits, permit applications, approvals, certificates of occupancy, dedications, subdivision maps and entitlements of any kind now or hereafter issued, approved or granted by any governmental entity or quasi-governmental entity in connection with the Real Property and Improvements, together with all renewals and modifications thereof

b.     So long as this Contract remains in effect, Purchaser may take the following actions:

1.     Conduct  an  engineering  and  economic  feasibility  study, environmental and other studies of the Real Property,  to determine that the Property is suitable, in Purchaser's sole and absolute discretion, for Purchaser's intended use of the Property.

2.     Conduct all such further inspections, tests, and examinations as Purchaser deems necessary of the Real Property and any other items which are a part of the Property.  Seller hereby grants Purchaser (or Purchaser's representative) the right to enter the Land for the purpose of conducting said inspections, tests and examinations.

3.     After written approval by Seller, make submittals to governmental authorities, agencies, and departments with jurisdiction over the Real Property and Purchaser's proposed improvements.

-5-

Seller agrees to cooperate fully with Purchaser's efforts and to obtain its requisite approvals described in this Contract and to satisfy the conditions contained in this Contract as well as to enable Purchaser to obtain and complete such confirmations, studies and reports as Purchaser may desire provided, however, Purchaser shall and does hereby agree to (i) repair any damage to the Property caused by Purchaser's inspections and (ii) to the extent, if any, permitted by applicable law, indemnify and hold harmless Seller from and against (w) any third party claims for injury to person or damage to property of such third parties that Seller may suffer or incur to the extent caused by such inspection, (x) costs of repairing any damage to the Property to the extent caused by such inspections and testing, (y) any and all reasonable attorneys' fees and court costs incurred by Seller in connection with any such claims or activities, and (z) mechanic's liens or claims that may be filed on or asserted against the Property by contractors, subcontractors or materialmen performing such work for Purchaser, provided however, in no event shall the foregoing indemnity extend to (A) loss or damage arising out of or resulting from the discovery, exposure or release by Purchaser or any of its employees, agents or contractors of hazardous materials or substances in, on, or about the Property or matters or conditions that existed prior to such inspections, (B) any diminution in the value of the Property resulting from the results of such inspections or tests , or (C) any loss or damaged caused by Seller's negligence or intentional misconduct. The foregoing indemnity will survive Closing or any termination of this Contract for any reason. Purchaser shall use commercially reasonable efforts not to disturb the activities of tenants of the Property during any such inspections. To this end, Seller shall execute such forms and requests as may be reasonably required from the owners of the Property to satisfy such conditions. No investigation or inspection by Purchaser or Purchaser's representatives shall be deemed to have in any way diminished or waived the representations, warranties or covenants of Seller set forth in this Contract.

c.    Purchaser shall until May 2, 2011 (the "Due Diligence Period") to enter into the Joint Venture and to continue its inspection, review and approval of the physical condition of the Property, entitlements, the environmental, geological and seismic condition of the Property, zoning and other restrictions, economic and feasibility studies, the Submission Matters and such other matters as Purchaser shall deem appropriate, in its sole and absolute discretion. On or before the expiration of the Due Diligence Period, Purchaser shall notify Seller and Escrow Holder in writing, in its sole and absolute discretion of its approval of the Property, and that it has entered into the Joint Venture (the "Venture Notice"). If Purchaser fails to deliver the Venture Notice prior to the end of the Due Diligence Period, it  shall be deemed to have terminated this Contract, in which event neither party shall have any further obligations hereunder, except those which expressly survive the termination of this Contract and the Earnest Money shall be promptly returned to the Purchaser.

Section 6.    No Agreements to be Assigned. There are no operating or management agreements affecting the Real Property or Improvements, but if any are found to exist, Seller shall promptly terminate all of them.

Section 7.    Contingencies. Purchaser's obligations to close the purchase and sale are contingent and specifically conditioned upon the satisfaction or waiver of each of the following:

a.    Seller providing all Submission Matters, in accordance with Section 5, and satisfying all other requirements of Seller under this Contract in the manner and within the time

-6-

periods provided herein and such items being true, complete and correct in all material respects when provided and remaining true, complete and correct through Closing Date, with no material change, alteration or amendment occurring thereto or to the facts or matters therein provided; provided, however, nothing herein shall require Seller to provide any historical financial information with regard to the Property.

      b.    All the representations, warranties and covenants of Seller being true and correct in all material respects as of the Effective Date and as of the Closing, and the performance by Seller of all its obligations or agreements in the manner and within the time periods provided herein.

      c.    Seller's termination of all management, operating and other agreements, if any, in regard to the Land and Improvements, at or by Closing.

      d.    Seller's termination of all leases, if any, contracts, if any, with third parties for use or occupancy of any portion of the Land.

      e.    On the day of Closing, no parties or persons are in possession of any portion of the Land or Improvements and that no parties or persons have any right to use or possess any portion of the Land or Improvements.

      e.    As of the Closing, there shall have been no material adverse change in the Property.

      f.    All instruments and documents required on Seller's part to effectuate the Closing as set forth herein and the transactions contemplated hereby shall be delivered to Purchaser or the Escrow Agent, as required hereby, and shall be in form and substance consistent with the requirements herein.

      g.    At the Closing, Title Company shall have delivered to Purchaser either (a) the Title Policy and any endorsements reasonably requested by Purchaser that the Title Company has agreed to issue, insuring Purchaser's fee simple title to the Land, or (b) the Title Company's irrevocable commitment to issue such policy.

      h.    The simultaneous closing of the transactions contemplated by each of the Related Purchase Contracts.

      i.    Purchaser shall have entered into the Joint Venture.

      j.    Purchaser, Seller and Seller's Affiliates shall have entered into a limited liability company agreement for the Sponsor Entity of the Joint Venture.

If any of the contingencies specified in this Section 7 are not satisfied or waived pursuant to the terms thereof or within the time periods provided, Purchaser, at its option, may terminate and the Purchaser shall receive a return of the Earnest Money, free of any claims by Seller or any other person with respect thereto, and neither party hereto shall have any further rights or obligations hereunder (except for any obligations or liabilities under this Contract which specifically set forth that such obligations or liabilities shall survive the termination of this

-7-

Contract, including Purchaser's rights and remedies set forth in <u>Section 10</u>), or at Purchaser's option, Purchaser may (i) waive any of the aforementioned contingencies and proceed with the closing of this transaction; or (ii) in the case of the failure of any of the conditions described in <u>Section 7 c, d or e</u>, extend the date for Closing until each of such conditions has been satisfied. The date upon which each of the conditions specified in <u>Section 7 c, d and e</u> have been satisfied is herein called the "Conditions Satisfaction Date."

**Section 8.** <u>Closing</u>.

a. The closing ("<u>Closing</u>") of the sale of the Property by Seller to Purchaser shall occur on or before [May 9, 2011], except for Seller's right to extend the closing to obtain the approval as referenced in <u>Section 7</u> or <u>Section 9</u> hereof. The Closing shall occur in the offices of the Title Company.

b. At the Closing, the following shall occur, all of which shall be deemed concurrent conditions:

1. Seller shall deliver or cause to be delivered to Purchaser:

a. At Seller's expense (except for any endorsements to the Title Policy which shall be at Purchaser's sole cost and expense), a Form T-1 standard coverage owner's policy of title insurance ("<u>Title Policy</u>") issued by the Title Company insuring, in the full amount of the Purchase Price, that after Closing, Purchaser shall be the owner of good and indefeasible fee simple title to the Property, subject only to the Permitted Exceptions and any exceptions waived by Purchaser pursuant to <u>Section 4(d)(ii)</u> hereof. The Title Policy shall be in the form prescribed by <u>Section 4(b)</u>.

b. A Special Warranty Deed ("<u>Deed</u>") in the form of <u>Exhibit C</u> attached hereto, duly executed and acknowledged by Seller for the Property conveyed by Seller, conveying good and indefeasible, fee simple title to the Property to Purchaser free and clear of any liens and encumbrances other than the Permitted Exceptions (the list of Permitted Exceptions attached to the Deed shall not, however, include the standard printed exceptions contained in the Title Policy or the Commitment), and any exceptions waived by Purchaser pursuant to <u>Section 4(d)(ii)</u> hereof.

c. A Bill of Sale in form and substance reasonably satisfactory to the parties, duly executed and acknowledged by Seller, conveying the Personal Property to Purchaser free and clear of any liens and encumbrances.

d. An assignment to Purchaser all of Seller's right, title, and interest, if any, in and to contracts, permits, intangible personal property, warranties, guaranties, and all licenses and permits, which assignment in the form approved by Purchaser, duly executed by Seller.

-8-

     e.    A counterpart member signature page to Purchaser's Operating Agreement.

     f.    Ad valorem tax statements for the Property for the calendar year of the Closing, if available and if not previously presented.

     g.    At Seller's expense, financing statement searches from the Secretary of State of Texas indicating that there are no financing statements affecting the Personal Property which will not be released at Closing.

     h.    A non-foreign affidavit pursuant to the provisions of Section 1445 of the Internal Revenue Code of 1986, as amended.

     i.    Such evidence of the authority and capacity of Seller and its representatives as Purchaser and/or the Title Company may reasonably require.

     j.    Affidavit of Title, including customary indemnification obligations by Seller and Seller's principals, subject only to the Permitted Exceptions, and stating that Seller has sole and exclusive possession of the Land and Improvements stating that either: (1) there have been no improvements, repairs or changes to the Land or Improvements between the date of this Contract and the Closing; or (2) if there have been any such improvements, repairs or changes to the Land or Improvements, all lienors or potential lienors for such improvements, repairs or changes have been paid in full, together with such other documentation reasonably required by Title Company, including evidence of authority to consummate the sale, in form and substance reasonably acceptable to Title Company.

     k.    Such other instruments as are customarily executed in the State of Texas to effectuate the conveyance of property similar to the Land, with the effect that, after Closing, Purchaser will have succeeded to all of the rights, titles, and interests of Seller relating to the Land and to transfer to Purchaser all of the sanitary sewer discharge treatment capacity allocated to the Land or held by the Seller for the use and benefit thereof.

     2.    Exclusive and vacant possession of the Land and Improvements.

     3.    Purchaser shall deliver or cause to be delivered to Seller:

     a.    A wire transfer to the Title Company in the amount of the Cash Consideration (less the Earnest Money and any other credits or deductions provided hereunder).

     b.    Such evidence of the authority and capacity of Purchaser and its representatives as Seller and/or the Title Company may reasonably require.

4.    Title Company shall deliver the Earnest Money to Seller to apply to the Cash Consideration.

5.    Ad valorem and personal property taxes for the year in which the Closing occurs shall be prorated to the Closing Date based upon actual days involved. Seller shall be responsible for payment of all ad valorem and personal property taxes for any period prior to the Closing. The Title Company shall ensure payment for all ad valorem taxes to the appropriate taxing authorities at Closing.

6.    Escrow fees, if any, due at the Closing, shall be borne and paid by Seller and Purchaser equally. Seller shall pay all recording fees in connection with the recordation of the Deed.

7.    At Closing all bills for gas, water, sewer, electricity, telephone and other utilities shall be prorated through the Closing date, and Seller shall pay through Escrow or provide evidence of payment of all other costs and expenses incurred in connection with the ownership of the Property through the Closing Date.

**Section 9.**  Representations, Warranties and Covenants of Seller.

a.    Seller represents, warrants and covenants to Purchaser that, as of the Effective Date and at Closing:

1.    Seller is a limited partnership organized, validly existing, and in good standing under the laws of the State of Texas and has the power to enter into this Contract and to execute and deliver this Contract and to perform all duties and obligations required of it hereunder. This Contract and all agreements, instruments, and documents herein provided to be executed by Seller are, and as of the Closing will be, duly authorized, executed, and delivered by, and are and will be binding upon Seller when executed and delivered; and on the Closing Date will not violate any provision of any agreement or judicial order to which Seller is a party or to which Seller or the Property is subject. No consent of any partner, shareholder, creditor, investor, judicial or administrative body, government agency, or other party is required for Seller to enter into or to perform Seller's obligations under this Contract, except as has already been obtained.

2.    Seller holds good and indefeasible fee simple title to the Land, and said title is free and clear of all mechanic's liens, except for mechanic's liens to be removed or bonded around prior to Closing, liens, mortgages, or encumbrances of any nature (except for Permitted Exceptions and those liens to be discharged prior to or at Closing), and no work has been performed or is in progress by Seller for which sums are due to any party, and no materials have been furnished to the Land or any portion thereof the cost of which has not been paid, which might give rise to mechanic's, materialman's or other liens against the Land or any portion thereof, except for items being disputed by Seller in good faith. In addition, there are no unpaid debts, liabilities or claims arising from the ownership or operation of the Land other than those debts, liabilities or claims which are the subject of proration and adjustment or payment under Section 8b.7 or mechanic's liens being disputed in good faith.

-10-

3.      Seller has received no written notice of any currently outstanding violations of any federal, state, county, or municipal law, ordinance, order, regulation, or requirement affecting the Property.

4.      No portion of the Property is, or as of the date of the Closing will be, affected by any general, special, or other assessments which remain unpaid or which constitute or which could mature into a lien on the Property, excluding current year ad valorem property taxes levied by all applicable taxing authorities, and the Seller has not received notice of any general, special, or other assessment affecting the Property.

5.      There are no actions, suits or proceedings (including condemnation proceedings) pending or, to Seller's actual knowledge, threatened, against Seller or the Property, which Seller has not previously disclosed in writing to Purchaser or any portion thereof, (except for mechanic's liens to be discharged or bonded around prior to Closing) or any part thereof or Seller's ability to perform hereunder, including, without limitation, actions, suits or proceedings which question the compliance of the Real Property with any applicable rules, ordinances, laws and regulations affecting the Real Property.

6.      Seller has not received written notice of any condemnation, eminent domain, zoning or other land-use proceeding, instituted or pending or, to the best of Seller's knowledge, threatened, against the Property.

7.      Seller has received no written notice of, nor has any knowledge of, any "Hazardous Materials" located on, under, or about the Land, or that the Land is in violation of any law concerning Hazardous Materials except as disclosed in the Submission Matters. As used in this Contract, the term "Hazardous Materials" shall mean (1) hazardous wastes, hazardous materials, hazardous substances, hazardous constituents, toxic substances or related materials, whether solids, liquids or gases in amounts greater than those typically found to be commercially reasonable for cleaning and property maintenance, including, but not limited to, substances deemed as "hazardous wastes," "hazardous materials," "hazardous substances," "toxic substances," "pollutants," "contaminants," "radioactive materials," or other similar designations in, or otherwise subject to regulation under, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9601 et seq.; the Toxic Substance Control Act ("TSCA"), 15 U.S.C. § 2601 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 1802; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 9601, et seq.; the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300 et seq.; the Clean Air Act ("CAA"), 42 U.S.C. § 7401 et seq.; and in any permits, licenses, approvals, plans, rules, regulations or ordinances adopted, or other criteria and guidelines promulgated pursuant to the preceding laws or other similar federal, state or local laws, regulations, rules or ordinances now or hereafter in effect relating to environmental matters (collectively the "Environmental Laws"); and (ii) any other substances, constituents or wastes subject to any applicable federal, state or local law, regulation, ordinance or common law doctrine, including any Environmental Laws, now or hereafter in effect, including, but not limited to, (A) petroleum, (B) refined petroleum products, (C) waste oil, (D) waste aviation or motor vehicle fuel, (E) asbestos, (F) lead in water, paint or elsewhere, (G) radon, (H) polychlorinated biphenyls (PCB's) and (I) ureaformaldehyde.

-11-

8.    All bills and other payments due with respect to the ownership, operation, leasing, development and maintenance of the Property have been paid or will be paid prior to Closing in the ordinary course of business

9.    Seller is not, and will not become, a person or entity with whom U. S. persons or entities are restricted from doing business with under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated Nationals and Blocked Persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and will not engage in any dealings or transactions or be otherwise associated with such persons or entities.

10.    No portion of the Property shall, as of or subsequent to the Closing Date, be subject to the burdens or obligations of any management or other agreement pertaining to the operation and use of the Property by Purchaser without Purchaser's prior consent.

11.    To Seller's knowledge, all of the Submission Matters supplied from Seller to Purchaser are true, accurate, and complete in all material respects.

12.    There are no contracts or other obligations outstanding for the sale, exchange, or transfer of the Real Property or any portion thereof.

13.    There are no attachments, executions, assignments for the benefit of creditors, receiverships, conservatorships, or voluntary or involuntary proceedings in bankruptcy or pursuant to any other debtor relief laws contemplated or filed by Seller or pending against Seller or the Property.

14.    Between the Effective Date of this Contract and Closing, the Seller shall:

(a)    Without the prior written consent of Purchaser, not enter into any new written or oral agreements or amend, extend or renew any existing agreements with respect to the Property, including any leases or licenses, that will not be fully performed by Seller on or before the Closing Date;

(b)    Advise Purchaser promptly of any litigation, arbitration, administrative hearing, or legislation before any governmental body or agency of which Seller is notified concerning or affecting the Property which is instituted or threatened after the Effective Date;

(c)    Not sell, offer for sale, mortgage, pledge, encumber or otherwise transfer, remove or dispose of all or any part of the Property or any interest therein or enter into a binding agreement with any third party to sell all or any portion of the Property;

-12-

(d)    Maintain in full force and effect existing insurance coverages or replacement insurance with coverage that is not materially less favorable; and

(e)    Notify Purchaser of any material change in the representations and warranties of Seller set forth above.

The continued validity in all respects of the representations, warranties and the performance of all of the covenants set forth in the above paragraph, both at the time same are made and as of the Closing, shall be a condition precedent to Purchaser's obligations hereunder. All representations and warranties of Seller contained in this <u>Section 9</u> shall be deemed remade as of the date of Closing (subject to the provisions of <u>Section 9 b</u> below) and shall survive Closing for a period of one (1) year.

b.    If, prior to the Closing, either Seller or Purchaser discovers that any of the representations and warranties contained in <u>Section 9</u> are incorrect, the applicable party promptly shall notify the other party in writing of the facts or circumstances making the applicable representation and warranty incorrect. If Seller notifies Purchaser in writing within five (5) days of such discovery that any of the representations and warranties of Seller contained in <u>Section 9</u> are materially incorrect, Seller shall have ten (10) days to cure such objection, insure around it to the satisfaction of Purchaser, or provide written notice to Purchaser of Seller's refusal or inability to cure ("<u>Seller's Representation Cure Period</u>"). If Seller is unable or unwilling to cure to the satisfaction of Purchaser by the expiration of Seller's Representation Cure Period, Purchaser may, within five (5) days of the expiration of Seller's Representation Cure Period ("<u>Purchaser's Response Period</u>"), at its option, either: (i) waive such objection, or (ii) terminate this Contract by delivering written notice of such election to Seller. If Purchaser elects to terminate the Contract, then Purchaser shall be entitled to a refund of all Earnest Money.    If such representation or warranty (1) was untrue as of the Effective Date or (2) became untrue after the Effective Date due to the acts or omissions of Seller (or any of its agents, contractors or employees) after the Effective Date, then in either such case Purchaser shall also have the right to reimbursement from Seller for all out of pocket costs and expenses incurred by Purchaser in regard to this Contract including, by way of example and not limitation, all of Purchaser's appraisal and due diligence costs and expenses (Purchaser's rights under this sentence shall expressly survive any termination of this Contract and Purchaser shall have all rights and remedies available at law or in equity in the enforcement hereof). If Seller notifies Purchaser in writing prior to the Closing or if Purchaser obtains actual knowledge prior to the Closing that any of the representations and warranties contained in <u>Section 9</u> are incorrect and Purchaser does not elect to terminate this Contract, Purchaser conclusively and irrevocably shall be deemed to have accepted the facts or circumstances making the applicable representation and warranty incorrect and to have waived and released all claims against Seller with respect thereto, including, without limitation, all claims for breach of the applicable representation and warranty.

-13-

**Section 10.**    Representations, Warranties and Covenants of Purchaser.    Purchaser represents, warrants and covenants to Seller that, except as otherwise specifically set forth in this Contract, including Seller's Representations and Warranties in Section 9, the approval or waiver of the Contingencies in Section 7, and the provisions of any document delivered in connection with the Closing, as of the Effective Date and at Closing:

a.    Seller will convey the Property "AS IS", "WHERE IS".    Purchaser expressly acknowledges that, in consideration of Seller's agreements, AND AS A MATERIAL INDUCEMENT TO SELLER TO ENTER INTO THIS CONTRACT AND TO SELL THE PROPERTY TO PURCHASER, PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT: (I) PURCHASER IS PURCHASING THE PROPERTY IN "'AS IS', 'WHERE IS' CONDITION, WITH ALL FAULTS"; (II) PURCHASER IS PURCHASING THE PROPERTY SUBJECT TO ALL EXISTING LAWS, STATUTES, ORDINANCES, CODES, RULES, AND REGULATIONS, AND PURCHASER SHALL BE RESPONSIBLE FOR THE PAYMENT OF ALL CONNECTION CHARGES, PRO RATA FEES, DEVELOPER LIABILITY PAYMENTS, AND LIKE CHARGES, FEES, AND PAYMENTS REQUIRED IN CONNECTION WITH THE UTILIZATION OF UTILITIES, ROADS, OR OTHER SIMILAR IMPROVEMENTS TO SERVE THE PROPERTY AND/OR ANY IMPROVEMENTS EXISTING OR HEREAFTER CONSTRUCTED OR PLACED THEREON ACCRUING FROM AND AFTER THE CLOSING DATE; (III) EXCEPT AS EXPRESSLY SET FORTH IN SECTION 9 HEREIN AND EXCEPT FOR THE SPECIAL WARRANTY OF TITLE CONTAINED IN THE DEED AND ANY OTHER REPRESENTATIONS OR WARRANTIES SET FORTH IN ANY OF THE OTHER DOCUMENTS EXECUTED BY SELLER AT CLOSING, NEITHER SELLER NOR ANY PARTY REPRESENTING SELLER HAS MADE ANY WARRANTY OR REPRESENTATION TO PURCHASER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO THE PROPERTY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OR REPRESENTATIONS CONCERNING HABITABILITY, SUITABILITY, MERCHANTABILITY, WORKMANSHIP, VALUE, ENVIRONMENTAL CONDITIONS, INCOME TO BE DERIVED FROM THE PROPERTY, EXPENSES TO BE INCURRED IN CONNECTION WITH THE PROPERTY, ZONING, BUILDING CODE, PLATTING, SUBDIVISION, ACCESS, AVAILABILITY OF UTILITIES OR COMPLIANCE WITH ANY LAWS, STATUTES, ORDINANCES, CODES, RULES, OR REGULATIONS; AND (IV) EXCEPT FOR THE EXPRESS WARRANTIES AND REPRESENTATIONS CONTAINED IN SECTION 9 AND THE SPECIAL WARRANTY OF TITLE CONTAINED IN THE DEED, PURCHASER WILL NOT RELY ON ANY IMPLIED WARRANTY OR REPRESENTATION OF SELLER OR ANY PARTY REPRESENTING SELLER BUT INSTEAD WILL RELY ON PURCHASER'S INSPECTIONS, TESTS, SURVEYS, PROCEDURES, AND INVESTIGATIONS OF THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY REPORTS, AUDITS, ASSESSMENTS, STUDIES, SURVEYS, OR OTHER INFORMATION WITH RESPECT OR PERTAINING TO THE PROPERTY FURNISHED TO PURCHASER BY SELLER (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL REPORTS AND ANY ENGINEERING REPORTS) OR BY ANY PARTY REPRESENTING SELLER HAVE BEEN PROVIDED BY SELLER TO PURCHASER WITHOUT ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, ORAL OR WRITTEN, CONCERNING THE ADEQUACY OR THE ACCURACY THEREOF AND THAT PURCHASER WILL NOT RELY THEREON BUT INSTEAD WILL RELY ON PURCHASER'S OWN

-14-

INDEPENDENT INVESTIGATIONS OF THE PROPERTY TO DETERMINE WHETHER THE PROPERTY IS IN A CONDITION SATISFACTORY TO PURCHASER AND WHETHER THE PROPERTY IS SUITABLE FOR PURCHASER'S INTENDED USE. Purchaser acknowledges that Purchaser is entering into this Contract in reliance on Purchaser's own abilities and investigation and not on any representation, warranty, or agreement of Seller, other than as stated in this Contract. Purchaser acknowledges that no representations have been made by Seller or Seller's agents or employees to induce Purchaser to enter into this transaction other than as expressly stated in this Contract. This Section 10 a. shall survive the Closing.

b.     PURCHASER ACKNOWLEDGES TO SELLER THAT PURCHASER HAS KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT ENABLE PURCHASER TO EVALUATE THE MERITS AND RISKS OF THE TRANSACTION CONTEMPLATED BY THIS CONTRACT.  FURTHER, PURCHASER ACKNOWLEDGES THAT PURCHASER IS NOT IN A DISPARATE BARGAINING POSITION RELATIVE TO SELLER WITH RESPECT TO THIS CONTRACT.  TO THE EXTENT APPLICABLE AND PERMITTED BY LAW (AND WITHOUT ADMITTING SUCH APPLICABILITY), PURCHASER HEREBY WAIVES THE PROVISIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT, CHAPTER 17, SUBCHAPTER E, SECTION 17.41 THROUGH 17.63, INCLUSIVE (OTHER THAN SECTION 17.555, WHICH IS NOT WAIVED).

**Section 11.**  Default.

a.     If the Purchaser fails to meet, comply with or perform any of Purchaser's covenants, agreements or obligations hereunder within the time limits and in the manner required either prior to or at Closing or fails or refuses to consummate the purchase of the Property pursuant to this Contract at the Closing for any reason other than termination of this Contract by Purchaser pursuant to a right to so terminate expressly set forth in this Contract or Seller's failure to meet, comply with or perform Seller's covenants, agreements or obligations under this Contract and such failure continues uncured for a period of twenty-one (21) days following written notice thereof to Purchaser, then Seller shall have the right, as Seller's sole and exclusive remedy, to terminate this Contract by giving written notice thereof to Purchaser and Title Company at or prior to Closing in which case, neither party hereto shall have any further rights or obligations hereunder, and Title Company shall deliver the Earnest Money to Seller as liquidated damages, free of any claims by Purchaser or any other person with respect thereto, the parties hereby agreeing that actual damages in the event of Purchaser's failure to perform would be difficult or impossible to determine accurately.

b.     If Seller defaults in any of its material obligations hereunder, and such default continues uncured for a period of fourteen (14) days following written notice thereof to Seller, or if any of Seller's representations, warranties or covenants set forth herein are untrue or inaccurate in any material respect and not cured as set forth herein to the satisfaction of Purchaser, then Purchaser shall have the right to either (i) terminate this Contract by giving written notice thereof to Seller and Title Company at or prior to Closing and receive a refund of the Earnest Money and reimbursement by Seller of Purchaser's actual out-of-pocket costs paid in connection with the transactions hereunder (such reimbursement not to exceed an aggregate total of $100,000.00) but no other action, for damages or otherwise, shall be permitted, or (ii) enforce

specific performance of Seller's obligations under this Contract. If a court of competent jurisdiction refuses to issue an order of specific performance because Seller has conveyed an interest in the Property after the Effective Date or for similar reasons, then in that event Purchaser shall also have the right to seek and obtain damages against Seller. If Purchaser terminates or is deemed to have terminated this Contract pursuant to any right to so terminate as specified in this Contract, then neither party hereto shall have any further rights or obligations hereunder except as expressly provided herein, and Title Company shall deliver the Earnest Money to Purchaser, free of any claims by Seller or any other person with respect thereto.

**Section 12.** Real Estate Commission. Neither party has entered into any arrangement for the payment of a real estate commission in connection herewith. Each party agrees to indemnify and hold the other harmless from any claims for commission made by any other broker or agent which arise out of the acts or conduct of such party (except that in no event shall Purchaser's indemnification obligations extend to the claims of Broker); and provided that, Purchaser, as an agency of the State of Texas can indemnify and hold Seller harmless only to the extent authorized by the constitution and laws of Texas.

**Section 13.** Condemnation: Casualty.

a.    Notwithstanding any contrary provisions of the Texas Property Code, if prior to Closing the Property becomes subject to or is threatened with a taking by virtue of eminent domain, to any extent whatsoever, or any part thereof is condemned, Purchaser shall have the option to terminate this Contract or to proceed with the Closing. If Purchaser elects to terminate this Contract, the Earnest Money shall be returned to Purchaser free of any claim by Seller and any rights, duties, obligations and liabilities created hereunder shall cease. If Purchaser elects to proceed with the Closing, Seller shall assign to Purchaser at Closing all of Seller's rights in any condemnation proceeds with respect thereto; all proceeds realized from or in relation to the condemnation shall belong to the Purchaser. Seller agrees to immediately notify Purchaser of any eminent domain proceedings pending and not to settle or compromise any award therefor (or make a conveyance in lieu thereof) without Purchaser's prior written approval.

b.    Prior to Seller's delivery of possession of the Property to Purchaser at the Closing, the risk of loss or damage to the Property shall remain upon Seller. If the Property suffers material damages as a result of any casualty prior to the Closing, then Seller shall give written notice thereof to Purchaser promptly after the occurrence of the casualty. Purchaser shall accept the Property in its damaged condition, together with an assignment of Seller's insurance proceeds and a credit against the Cash Consideration for the amount of any deductible (and Seller hereby agrees that it shall not settle or compromise any insurance claim affecting the Property without Purchaser's prior written consent, which consent shall not be unreasonably withheld or delayed); provided, however, that if as result of any casualty, the Property sustains damage in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000.00) of the replacement or repair cost, then Purchaser can elect to either: (i) accept the Property in its damaged condition, together with an assignment of Seller's insurance proceeds and a credit against said Cash Consideration for the amount of any deductible (and Seller hereby agrees that it shall not settle or compromise any insurance claim affecting the Property without Purchaser's prior written consent, which consent shall not be unreasonably withheld or delayed); or (ii) terminate this Contract upon notice to Seller served within twenty (20) business days of such

-16-

casualty and delivery by Seller of an estimate of the damage to the Property, in which event the Earnest Money shall be returned to Purchaser.

**Section 14.** 1031 Exchange. Seller shall have the right to effect a tax free exchange under Section 1031 of the Internal Revenue Code and Purchaser agrees to cooperate with Seller in such exchange, provide the Purchaser does not incur any additional costs, expense or liability in connection with the exchange. Seller shall have the right to assign this Contract to an intermediary for purposes of the exchange.

**Section 15.** Time of Essence. Time is of the essence with respect to each and every matter pertaining to performance under this Contract.

**Section 16.** Waiver. Purchaser shall be entitled to waive any defect in title or other condition of this Contract and thereupon close the sale and purchase hereunder despite such defect or failure.

**Section 17.** Notice.

a.    Any notice required or permitted to be given hereunder by one party to the other shall be in writing and the same shall be given and shall be deemed to have been served and given upon the first to occur of (i) delivery in person or by facsimile transmission to the address set forth hereinbelow for the party to whom the notice is given; (ii) three (3) days after placing in the United States mail by certified address hereinafter specified; or (iii) one (1) day after deposit into the custody of Federal Express Corporation to be sent by Federal Express Overnight Delivery, addressed to such party at the address hereinafter specified.

b.    The address of Seller for all purposes under this Contract and for all notices hereunder shall be:

> CHSC Properties, Ltd.
> Attn: Leonard M. Ross
> 1011½ North Beverly Drive
> Beverly Hills, California 90210
> Phone: (310) 278-8194
> Fax: (310) 278-9677

with a copy to:

> David B. Giles
> 10440 North Central Expressway
> Suite 1030
> Dallas, Texas 75231
> Phone: (214) 696-8800
> Fax: (214) 242-3816
> Email: DavidGilesdallas@aol.com

    c.    The address of Purchaser for all purposes under the Contract and for all notices hereunder shall be:

> c/o Woodridge Capital Partners, LLC
> 1999 Avenue of the Stars, Suite 2850
> Los Angeles, California 90067
> Attention: Michael Rosenfeld
> Phone: (310) 824-2200
> Fax: (310)
> Email: Michael@WoodridgeCapital.com

with a copy to:

> Douglas J. Frye, Esq.
> Frye & Hsieh, LLP
> 24955 Pacific Coast Highway, Suite A201
> Malibu, California 90265
> Phone: (310) 456-0800
> Fax: (310) 456-0808
> doug@douglasfryelaw.com

    d.    From time to time either party may designate another address within the United States of America for all purposes of this Contract by giving the other party not less than 10 days advance written notice of such change of address in accordance with the provisions hereof.

**Section 18.**  Survival. The representations, warranties and covenants contained in Section 9 as surviving Closing and those requiring observance or performance after Closing shall survive Closing for one year except for those contained in Section 10 which shall not expire or terminate.

**Section 19.**  Construction. The parties acknowledge that each party and its counsel have reviewed and revised this Contract and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Contract or any amendments or exhibits hereto.

**Section 20.**  Entire Agreement. This Contract contains the entire agreement between Seller and Purchaser, and no oral statements or prior written matters not specifically incorporated herein shall be of any force or effect.  No variation, modification or changes hereof shall be binding on either party hereto unless set forth in a document executed by such parties or a duly authorized agent, officer or representative thereof.

**Section 21.**  Exhibits. All references to Exhibits contained herein are references to Exhibits attached hereto, all of which are made a part hereof for all purposes the same as if set forth herein verbatim, it being expressly understood that if any Exhibit attached hereto which is

to be executed and delivered at Closing contains blanks, the same shall be completed correctly and in accordance with the terms and provisions contained herein and as contemplated herein prior to or at the time of execution and delivery thereof.

**Section 22.** Parties Bound. This Contract shall be binding upon and inure to the benefit of Purchaser and Seller and their respective heirs, personal representatives, successors and assigns.

**Section 23.** Attorney's Fees. If it shall be necessary for either Purchaser or Seller to employ an attorney to enforce its rights pursuant to this Contract because of the default of the other party, the defaulting party shall reimburse the nondefaulting party for reasonable attorney's fees; provided, however, Purchaser's obligation to reimburse another party for its attorney's fees is limited to the extent authorized by the constitution and laws of the State of Texas.

**Section 24.** Further Acts. In addition to the acts recited in this Contract to be performed by Seller and Purchaser, Seller and Purchaser agree to perform or cause to be performed at the Closing or after the Closing any and all such further acts as may be reasonably necessary to consummate the transactions contemplated hereby.

**Section 25.** Governing Law; Venue. This Contract shall be governed and construed by the laws of the State of Texas. All obligations herein shall be performable in Brazos County, Texas. The parties hereby stipulate and agree that any suit or proceeding brought to enforce any obligation or covenant under this Contract shall be brought exclusively in Brazos County, Texas, it being stipulated and agreed that such County is the exclusive County for venue for any such suit or proceeding.

**Section 26.** Miscellaneous. Whenever the context of this Contract so requires, the singular shall include the plural, the plural shall include the singular, the whole shall include any part thereof, and any gender shall include all other genders. All terms defined in the Contract shall have such defined meanings when used herein. The paragraph headings contained herein are for convenience and reference only and are not intended to define or limit the scope of any provision of this Contract. The provisions of this Contract shall be deemed independent and severable, and the invalidity or partial invalidity or unenforceability of any one provision or portion thereof shall not affect the validity or enforceability of any other provision hereof. If the last day of any time period stated herein shall fall on a Saturday, Sunday or legal holiday, then the duration of such time period shall be extended so that it shall end on the next succeeding day which is not a Saturday, Sunday, or legal holiday. Time is of the essence with respect to this transaction and each provision of this Contract.

**Section 27.** Effective Date. The Effective Date of this Contract shall be when the Title Company receives a copy of a fully executed counterpart of this Contract, as evidenced below.

**Section 28.** Confidentiality. Purchaser and Seller agree to keep all discussions, and any other matters relating to this Contract, confidential, except for necessary disclosure to partners, employees, accountants, attorneys, lenders, and consultants of either Seller or Purchaser, and in the case of Purchaser, real estate appraisers.

**Section 29.**  Executed Copies. This instrument may be executed in any number of counterpart copies, each of which counterparts shall be deemed an original for all purposes.

**Section 30.**    Bankruptcy Court Approval.  Notwithstanding anything contrary herein, the parties acknowledge proceedings in that certain matter entitled In Re Rossco Holdings, Inc., Bankruptcy Case No. 2:10-bk-55951-VZ, and that this Contract is subject to the approval of the Court therein.

*[end of page; signature page follows]*

-20-

EXECUTED in duplicate originals this ___/3___ day of April, 2011, by Seller, by its duly authorized officer.

SELLER:

ROSSCO HOLDINGS INCORPORATED, a California corporation

By: _____
        Leonard Ross, President

EXECUTED in duplicate originals this __13__ day of April, 2011, by Purchaser, by its duly authorized signator.

PURCHASER:

WOODRIDGE CAPITAL FINANCE FUND I, LLC,
a Delaware limited liability company

By: Woodridge Capital Partners, LLC,
        a California limited liability company, its Manager

By: _____
        Michael Rosenfeld, Manager

-21-

Exhibits

A – Land

B – Intentionally Deleted

C – Form of Special Warranty Deed

D – Form of Bill of Sale

## RECEIPT OF AGREEMENT OF TITLE COMPANY

Fidelity Title, Dallas, Texas hereby acknowledges the receipt of one (1) fully signed and executed copy of this Contract.

FIDELITY NATIONAL TITLE AGENCY, INC.

By: _____

Name: _____

Title: _____

Date: _____

# EXHIBIT A

## LEGAL DESCRIPTION OF LAND

## EXHIBIT B

## INTENTIONALLY DELETED

## EXHIBIT C

**NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:   YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## SPECIAL WARRANTY DEED

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF BRAZOS | § | |

_____, a _____ corporation ("Grantor"), for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to it in hand paid and caused to be paid by _____ ("Grantee"), whose address is _____, the receipt and sufficiency of which is hereby acknowledged and confessed, has GRANTED, BARGAINED, SOLD, ASSIGNED and CONVEYED, and by these presents does GRANT, BARGAIN, SELL, ASSIGN and CONVEY, unto Grantee:

The real property located in Brazos County, Texas and more particularly described in Exhibit A hereto attached and made a part hereof for all purposes and any and all structures, fixtures, and improvements situated thereon (collectively, the "Land"); together with all of Grantor's rights, titles, and interest, if any, in and to the following:  (i) all oil, gas, and other minerals in, on, under or that may be produced from said Land, (ii) all strips and gores between the Land and abutting properties, and (iii) all rights in and to easements, air rights, development rights, zoning approvals and permits, water rights, sewer rights and drainage rights incidental to such Land including, without limitation, all of the water and sanitary sewer discharge treatment capacity allocated to the Land or owned and held by Grantor for the use and benefit thereof and all zoning and development approvals or rights in respect thereto, and (iv) all of Grantor's rights to use, any of the foregoing (clauses (i) through (iii) above being herein collectively called the "Rights and Appurtenances" and the Land and the Rights and Appurtenances being herein collectively called the "Real Property").

TO HAVE AND TO HOLD the Real Property, together with all and singular any other rights and appurtenances thereto in anywise belonging, unto Grantee, its successors and assigns, FOREVER; and Grantor does hereby bind itself, its successors and assigns, to WARRANT AND FOREVER DEFEND all and singular the Real Property unto Grantee, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through, or under Grantor, but not otherwise.

The warranty of Grantor made herein is made subject to the matters listed on Exhibit B attached hereto and incorporated herein to the extent, but no further, that the same are valid and subsisting as of the date hereof and affect title to the Real Property.

1

**EXECUTED** this _____ day of May, 2011 by **GRANTOR**.

ROSSCO HOLDINGS INCORPORATED, a California corporation


By: _____
      Leonard Ross, President

2

<u>EXHIBIT A</u>
To Special Warranty Deed

[Legal Description – To Follow]

## EXHIBIT B
To Special Warranty Deed

Permitted Encumbrances

[To Be Completed]

## EXHIBIT D

## FORM OF THE BILL OF SALE

[Bill of Sale -To Follow]